COMMONWEALTH *vs.* DAVID L. CLARKE
(and five companion cases[1]).

Plymouth. March 7, 1994. - July 11, 1994.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Evidence*, Cross-examination, Impeachment of credibility, Common crimi-
nal enterprise, Admissions and confessions. *Constitutional Law*, Fair
trial, Confrontation of witness. *Witness*, Credibility. *Practice, Criminal*,
Judicial discretion, Request for fees and costs, Instructions to jury,
Capital case. *Homicide. Joint Enterprise.*

In the circumstances of a murder trial, the trial judge properly exercised
his discretion to exclude from evidence four written statements of a
prosecution witness that were inconsistent with his trial testimony and
that exculpated the defendants, where the statements, which the wit-
ness admitted making, were read in their entirety to the jury and the
witness was otherwise subject to thorough impeachment on cross-exam-
ination. [211-213]

In the circumstances of a defendant's conviction of murder in the first de-
gree for which he faced a mandatory life sentence without parole, the
trial judge did not abuse his discretion in concluding that the defend-
ant's request for $1,700 for a presentencing psychiatric report was ex-
cessive. [213-214]

Evidence at the trial of an indictment for murder in the first degree was
sufficient for the jury to conclude that a defendant had actively partici-
pated in a joint venture to commit the crime. [214-215]

At a murder trial there was no error in the judge's instructions to the jury
on joint venture. [215-217]

The judge at a murder trial did not err in denying a defendant's motion to
sever his trial from that of the other defendant where the nature of
their defenses was not such that the defendant seeking severance was
prejudiced and denied a fair trial. [217]

At a criminal trial, where out-of-court statements by one defendant who
did not testify were admissible against the codefendant as statements of
a joint venturer and where the judge correctly instructed the jury on
their consideration of that evidence, there was no violation of the

---

[1]Two against David L. Clarke and three against Steven A. James.

*Bruton* rule (*Bruton* v. *United States*, 391 U.S. 123 [1968]) as would require severance of the two defendants' trials. [218-219]

INDICTMENTS found and returned in the Superior Court Department, one on November 11, 1989; two on November 21, 1989; and three on December 4, 1989.

The cases were tried before *Cortland A. Mathers*, J.

*Bernard Grossberg* for David L. Clarke.

*Robert A. George* for Steven A. James.

*John E. Bradley*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The defendants, David L. Clarke and Steven A. James, appeal from their convictions of murder in the first degree, armed assault with intent to murder, and assault and battery by means of a dangerous weapon. The defendants were tried jointly, but raise separate issues on appeal. Clarke alleges error in the judge's refusal to admit as exhibits prior written inconsistent statements of the chief Commonwealth witness. He also claims that the judge abused his discretion in denying a motion for funds for a pre-sentencing psychiatric evaluation.

James's principal claim is that there was insufficient evidence to support his conviction of murder on a joint venture theory, and that the judge should have granted his motion for a required finding of not guilty. James also alleges error in the judge's instruction on joint venture and in the judge's refusal to grant his motion for severance. Both defendants request that we exercise our power under G. L. c. 278, § 33E (1992 ed.), to order a new trial or to enter a lesser degree of guilt on the convictions for murder in the first degree. We have reviewed the record and conclude that the convictions should be affirmed. We decline to exercise our power under G. L. c. 278, § 33E, in favor of the defendants.

*The facts.* The jury could have concluded that the Commonwealth's evidence established the following facts. On September 4, 1989, at approximately 7:30 P.M., Rolando Barros, Jose DeAndrade, and Maurice Ware were standing

at the corner of Wyman Street and Walnut Street in Brockton. Suddenly, DeAndrade heard the sound of several shots being fired, and felt a sharp pain in his stomach. DeAndrade was seriously injured. Barros died as a result of the shooting.

Ware, who was not injured, said that two or three days before the shooting, James approached him while he was in a parked automobile and ripped gold chains from his neck. Ware also said that he was on Walnut Street one-half hour before the shooting and saw James and Anibal Rodrigues-Lopes drive by the area slowly in a jeep-type vehicle. At around 7:30 P.M., Ware heard approximately thirty shots. Ware saw Barros and DeAndrade fall. Ware did not see the shooters.

Anibal Rodrigues-Lopes, a friend of both James and Clarke, was the principal witness for the Commonwealth. He testified pursuant to a grant of immunity. He testified that James had an argument with Maurice Ware and another member of the Ware family on the day of the shooting. The Ware family member threatened James. He said that "if he [James] didn't give him [Ware family member] the chain he was going to get him [James]." James and Rodrigues-Lopes then decided to go to Boston to locate James's brother to help James. They found James's brother, who promised to come back to Brockton that evening.

Later that day, Rodrigues-Lopes was at a party with Clarke, James, Anthony Greene,[2] and Caspar Forte. There was a discussion about the fact that James's brother had not appeared. Someone said, "Let's go up there ourselves to go get the Wares." Clarke then asked Rodrigues-Lopes to drive the group in his jeep. Once in the car, Rodrigues-Lopes saw that Clarke and Greene were armed with guns. Rodrigues-Lopes parked near the corner of Wyman and Walnut Streets. Clarke and Greene walked down the street out of Rodrigues-Lopes's view. James and Forte remained in the ve-

---

[2]Greene's case was severed from the other defendants. After Clarke and James were convicted, Greene pleaded guilty to second degree murder. Caspar Forte was not charged with any crimes.

hicle. At some point, James got out of the vehicle. When they heard the gunshots, James looked to see if Clarke and Greene were coming back and told Rodrigues-Lopes, "Get ready to leave." When Clarke and Greene returned one of them said, "I think I got somebody." The five men then drove back to Clarke's apartment before going out to a club together that evening.

The next day, at Clarke's apartment, Rodrigues-Lopes told Clarke that it was his cousin, Rolando Barros, who was killed. Clarke apologized and said, "he [Barros] was at the wrong place at the wrong time." Samuel Jordan, a friend of the defendants, was at Clarke's apartment at that time. He overheard Clarke's comment to Rodrigues-Lopes about Barros. Jordan also said that Clarke admitted to shooting Barros, and described how he and Greene had fired. Clarke was not sure whether he or Greene had killed Barros.

During this conversation, Jordan saw James and Clarke packing to go to Boston. Clarke pulled a gun out of a shoebox and stated, "We won't be needing these no more." James responded, "Ant [Anthony Greene] might want his gun." Clarke then said, "We're going to get rid of them because they're going to get us caught and in trouble." Clarke suggested putting the guns in the woods. James disagreed and said he wanted to keep his. Jordan also testified that he witnessed the argument between Ware and James on the day of the shooting.

Neither defendant testified at trial. Clarke's defense was that Rodrigues-Lopes was not a credible witness. He impeached Rodrigues-Lopes's testimony with his lengthy criminal record. He also impeached Rodrigues-Lopes's testimony with several prior inconsistent statements in which he said that he had no knowledge of any crimes committed by Clarke, and that the five men were all at a bar in New Bedford at the time of the shooting. James's defense was that he

was merely present in the car and not a participant in the crime.[3]

Clarke and James were convicted of all charges. For murder in the first degree, the defendants each received a mandatory life sentence without parole. On the conviction for assault with intent to murder, each was sentenced to a term of from eighteen to twenty years to be served concurrently with the life sentence. On the conviction for assault and battery by means of a dangerous weapon, Clarke received a sentence of from six to ten years to take effect from and after the life sentence; James received a sentence of from three to five years to be served from and after the life sentence.

*Clarke's appeal.* a. *Prior inconsistent statements.* On four occasions, Rodrigues-Lopes made statements inconsistent with his trial testimony. Those statements exculpated the defendants. The statements were reduced to writing by Mr. Jack Atwood, counsel for Greene, and signed by Rodrigues-Lopes.[4] Rodrigues-Lopes copied one of the statements, prepared by Mr. Atwood, into his own handwriting. Rodrigues-Lopes admitted making the statements and signing the written documents. He said he lied when making the statements. Rodrigues-Lopes said he was scared and in jail when he made the statements.

On cross-examination, Clarke's counsel was permitted to read the statements, in their entirety, to the jury. He then moved to admit the statements in evidence. The judge refused to admit the statements as exhibits because he did not want "to have them given any more weight than any other testimony." Clarke argues that the exclusion of the evidence violated his right to confront the witness and his right to present a defense. We do not agree.

---

[3]James's counsel argued to the jury that James was no more involved than Rodrigues-Lopes, who had immunity, and Forte, who was never charged.

[4]One of the written statements was stolen from Mr. Atwood's automobile. Clarke sought to introduce documentary evidence of the other three statements.

The accused in a criminal case is guaranteed the right to cross-examine the witnesses against him. *Commonwealth v. Franklin*, 376 Mass. 885, 904 (1978). However, the right of confrontation is not absolute. *Commonwealth v. Barnes*, 399 Mass. 385, 393 (1987). The scope of cross-examination, including the extent of impeachment of a witness for credibility, is within the judge's sound discretion. *Commonwealth v. Carrion*, 407 Mass. 263, 273 (1990). P.J. Liacos, Massachusetts Evidence 287-288 (6th ed. 1994).

Rodrigues-Lopes was subject to thorough impeachment on cross-examination. The jury heard all the prior inconsistent statements, including the testimony of Mr. Atwood who transcribed the statements. Clarke's right to reasonable cross-examination was not impermissibly restricted. See *Commonwealth v. Wilson*, 381 Mass. 90, 118 (1980).

Clarke relies on *Commonwealth v. Cogswell*, 31 Mass. App. Ct. 691 (1991), to support his argument that the judge had no discretion to exclude the statements. In *Cogswell*, the trial judge excluded a diary, in the complaining witness's own handwriting, which contradicted her trial testimony. The diary indicated that on the day of the alleged attack, she was not present where she claimed the attack occurred. The witness denied writing the inconsistent entry, but admitted writing the rest of the diary. The Appeals Court ruled that the diary should have been admitted to impeach her credibility. *Cosgwell, supra* at 698.

*Cogswell* does not stand for the proposition, as argued by Clarke, that a judge has no discretion to exclude documentary evidence of prior inconsistent statements. The witness in *Cogswell* denied writing the inconsistent diary entry. In this case, Rodrigues-Lopes admitted making false statements. He said he made the statements because he was scared. Unlike the handwritten diary in *Cogswell*, the written statements were prepared by Greene's defense counsel and merely signed by Rodrigues-Lopes.

Furthermore, the jury had before it ample impeachment evidence to assess the credibility of Rodrigues-Lopes. The jury knew he was testifying pursuant to a grant of immunity.

On cross-examination, defense counsel impeached Rodrigues-Lopes with approximately twenty prior convictions, many of them involving crimes of dishonesty. Most importantly, the statements themselves were read to the jury in their entirety. Admitting the statements as exhibits would have been cumulative of the evidence already before the jury. See *Commonwealth* v. *Rodwell*, 394 Mass. 694, 700 (1985). There was no error.

b. *Denial of funds for presentencing evaluation.* The defendant Clarke, who is indigent, requested funds for a presentencing psychiatric evaluation. The judge denied the funds, noting that the issue of mitigating factors was "academic" because Clarke faced a mandatory life sentence without parole for his conviction of murder in the first degree. The judge also determined that the amount requested, $1,700, was excessive in those circumstances.

The standard for deciding whether a request for extra fees and costs should be granted is set forth in G. L. c. 261, § 27C (1992 ed.).[5] "The standard is essentially one of reasonableness . . . whether the item is reasonably necessary to prevent the party from being subjected to a disadvantage in preparing or presenting his case adequately . . . ." *Commonwealth* v. *Lockley*, 381 Mass. 156, 160-161 (1980). "The test is not whether an item 'might conceivably contribute some assistance to the defense,' nor whether such an item 'would be acquired by a defendant who had unlimited resources'. . . ." *Commonwealth* v. *Souza*, 397 Mass. 236, 241 (1986), quoting *Lockley, supra.* In assessing a request for funds, a judge should look to whether a defendant who was able to pay and was paying the expenses himself, would consider the service sufficiently important that he would choose to obtain it in preparation for trial. *Souza, supra* at

---

[5] The relevant portion of the statute reads as follows: "If the court makes a finding of indigency, it shall not deny any request with respect to extra fees and costs if it finds the document, service or object is reasonably necessary to assure the applicant as effective a prosecution, defense or appeal as he would have if he were financially able to pay." G. L. c. 261, § 27C (4) (1992 ed.).

241. We conclude that, in light of the defendant's mandatory life sentence, the judge did not abuse his discretion in concluding that the defendant's posttrial request for $1,700 was excessive.[6]

*James's appeal.* a. *Sufficiency of the evidence.* James argues that the judge should have allowed his motion for a required finding of not guilty. He alleges that the Commonwealth failed to prove that he actively participated in the joint venture and that he was convicted on the basis of mere presence.

The critical inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Commonwealth v. Latimore,* 378 Mass. 671, 677 (1979). To sustain a conviction for joint venture, there must be evidence from which a jury could conclude that the defendant was present at the scene of the crime, with knowledge that another intends to commit a crime, and by agreement is willing and available to help the other if necessary. The prosecution must also show that the defendant shared with the principal the mental state required for the crime. See *Commonwealth v. Mandile,* 403 Mass. 93 (1988). See also *Commonwealth v. Stewart,* 411 Mass. 345, 350 (1991) ("A joint venturer is 'one who aids, commands, counsels or encourages commission of a crime while sharing with the principal the mental state required for the crime' "). Mere presence at the commission of the wrongful act and even failure to take affirmative steps to prevent it do not render a person liable as a participant. See *Commonwealth v. Clark,* 363 Mass. 467, 473 (1973); *Commonwealth v. Soares,* 377 Mass. 461, 471, cert. denied, 444 U.S. 881 (1979).

---

[6]We note that the defendant could have but did not move for a court-ordered evaluation pursuant to G. L. c. 123, § 15 (*e*) (1992 ed.). Under the statute, the judge may order a psychiatric or other clinical examination "to aid the court in sentencing." There is no basis on this record to show that the remedy provided by G. L. c. 123, § 15 (*e*), was insufficient so as to require "extra fees and costs" under G. L. c. 261, § 27C (4).

The Commonwealth presented evidence that James insti-
gated the confrontation with the Wares, setting in motion the
events which culminated in the shootings. The jury could
have found that after being threatened by the Wares, James
sought help from his brother. There was evidence that prior
to the attack James and Rodrigues-Lopes scouted the area
together in preparation for the subsequent attack. The jury
could conclude that James and Rodrigues-Lopes drove by the
area one-half hour prior to the attack in preparation for the
subsequent attack.

In addition, Rodrigues-Lopes testified that James was
present when someone said, "Let's go up there ourselves to
go get the Wares." Rodrigues-Lopes told the jury that he
drove James with the others, who were armed, to the crime
scene. He stated that James waited outside the car, while
Clarke and Green fired several shots a short distance away.
When the shooting began, James instructed the others to
"get ready to leave." He then looked to see if Clarke and
Greene were coming back. The jury could have concluded
that James knew that Clarke and Green were armed, acted
as a lookout, and stood ready and willing to aid the others.

Last, there was evidence that James showed a conscious-
ness of guilt by discussing with Clarke how to dispose of the
weapons on the day after the shootings. We have said that
the "line that separates mere knowledge of unlawful conduct
and participation in it, is 'often vague and uncertain. It is
within the province of the jury to determine from the evi-
dence whether a particular defendant [has] crossed that
line.' " *Commonwealth* v. *Stewart*, 411 Mass. 345, 350
(1991), quoting *Commonwealth* v. *Cerveny*, 387 Mass. 280,
287 (1982). There was sufficient evidence from which a jury
could have found James actively participated in the joint
venture. Consequently, there was no error in the judge's de-
nial of James's motion for a required finding of not guilty.

b. *Instruction on joint venture.* The defendant claims that
the judge's instruction gave the jury the erroneous impression
that mere presence at the crime scene was sufficient to con-
vict the defendant on a joint venture theory. The challenged

portion of the instruction is set forth in the margin.[7] James objected to the instruction at trial, and the judge gave a supplemental instruction at the defendant's request.[8]

When reviewing jury instructions, we look to the charge in its entirety, in light of its over-all impact on the jury. *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980). "A proper charge on [joint venture] comprises the elements of the abettor's sharing (it may be in a conditional sense) the mental state or intent of the main actor, and the element of actual participation." *Commonwealth* v. *Whitehead*, 379 Mass. 640, 650 (1980).

The defendant attacks portions of the instruction out of context. The judge's full instruction made clear that the Commonwealth must prove beyond a reasonable doubt "[f]irst, that the defendant aided or assisted in the commission of the crime or stood by willing and able to help with the crime if it became necessary, and second, that the defendant did so while sharing the intent required to commit the crime." The judge stressed that "if the defendant, James, is to be considered as guilty of [murder], he must share that intent, that specific intent, and the premeditation that go into the commission of the crime of murder in the first degree." The instruction does not imply that mere presence at the

---

[7]"Knowledge of the crime may be inferred from the defendant's presence at the scene of the crime and from activities surrounding its commission. One who is present during the commission of a crime, assents to it, and by arrangement is in a position where he might render some aid to the perpetrator is equally guilty as the perpetrator. Presence of the joint venturer under such circumstances encourages and emboldens the perpetrator to do the deed by giving him hope of immediate assistance."

[8]After his initial charge to the jury, the judge added, "To say a word further about the principles of joint enterprise, the law is not so refined that it requires one to avoid presence and knowledge of a joint enterprise. If I know that a person is going to commit a crime and I have knowledge of what he intends to do, I do not become a joint venturer, nor do I become involved in the joint enterprise unless I take some affirmative action along the lines of what I described to you. . . . [T]here must be more than [mere] presence and knowledge. There must be some intent to assist and desire for fulfillment of the criminal activities and/or actual participation of some sort in the crime."

scene of the crime was sufficient by itself to support a conviction based on joint venture.

Furthermore, if there were an ambiguity, it was resolved by the judge's supplemental instruction, which plainly stated, "I do not become a joint venturer, nor do I become involved in the joint enterprise unless I take some affirmative action along the lines of what I described to you. . . . [T]here must be more than mere presence and knowledge." There was no error in the jury instructions on joint venture.

c. *Severance.* James moved to sever his trial from Clarke's, pursuant to Mass. R. Crim. P. 9 (d), 378 Mass. 860 (1979). The judge denied the motion and the codefendants were tried jointly. James argues that he was unfairly prejudiced as a result because the evidence against him was slight in comparison to the evidence against Clarke. We do not agree.

Severance is a matter within the sound discretion of the trial judge. *Commonwealth* v. *Weaver,* 400 Mass. 612, 617 (1987). Joinder serves the public interest by promoting the efficient administration of justice. It conserves judicial resources, lessens the burden on citizens who must sacrifice time and energy to serve as jurors, and avoids the necessity of recalling witnesses to successive trials. *Id.* At some point, however, such considerations must yield to protect the rights of the accused. *Id.* That point is reached when "the prejudice resulting from a joint trial is so compelling that it prevents a defendant from obtaining a fair trial." *Commonwealth* v. *Moran,* 387 Mass. 644, 658 (1982).

This is not a case, like *Commonwealth* v. *Moran,* in which the defendants presented "mutually antagonistic and irreconcilable" defenses. *Moran, supra* at 659. The defendants did not seek to escape conviction by blaming each other. Clarke's defense was that the Commonwealth's witnesses were not credible. James's defense was that he was merely present, but not a participant in the crime. James was not entitled to severance of his trial on the basis that he "would have had a better chance of acquittal if he had been tried alone." *Moran, supra* at 659.

James further argues that he was denied a fair trial because incriminating extrajudicial statements made by Clarke were admitted against him in violation of his rights under the Sixth Amendment to the United States Constitution. See *Bruton* v. *United States*, 391 U.S. 123, 135-136 (1968). In *Bruton*, the Supreme Court held that it was a denial of the defendant's right of confrontation to admit a codefendant's confession inculpating him, when the codefendant did not take the stand and expose himself to cross-examination. See *Commonwealth* v. *LeBlanc*, 364 Mass. 1, 7 (1973).

James challenges the admission of statements made by Clarke the day after the shooting. Specifically, he objects to Clarke's statement that Barros, Rodrigues-Lopes's cousin, "was in the wrong place at the wrong time." He also objects to Clarke's statement that they were going to "get rid of them [the guns] because they're going to get us caught and in trouble."

There was no *Bruton* violation in this case because the statements were admissible against James as statements made by a joint criminal venturer. Out-of-court statements by joint criminal venturers are admissible against the others if the statements are made during the pendency of the criminal enterprise and in furtherance of it. See *Commonwealth* v. *White*, 370 Mass. 703, 708-709 (1976); *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 340 (1983).

The statements are admissible as long as the existence of a joint venture is established as a preliminary matter. *Bongarzone, supra* at 340. The judge properly left the determination of joint venture to the jury. See *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 545 (1990). He correctly instructed the jury that they may not consider the statement of one defendant against the other until and unless the Commonwealth proves the existence of a joint venture beyond a reasonable doubt. *Commonwealth* v. *Borans*, 379 Mass. 117, 145-146 n.26 (1979).

Clarke made the challenged statements at his apartment the day after the shooting. At that point, the defendants "were attempting actively to conceal evidence of the shooting

and to avoid detection and detention." *Colon-Cruz, supra* at 545. It was left to the jury to determine whether Clarke's statement about getting rid of the guns was made during the pendency of the joint venture and in furtherance of it. With regard to Clarke's statement about Barros being in the wrong place at the wrong time, the jury could have considered that the statement was made in furtherance of the joint venture in an effort to appease Rodrigues-Lopes to prevent him from reporting the crime. Certainly, the interests of Clarke and James were still closely bound together at that point. See *Colon-Cruz, supra* at 545.

We conclude that the judge did not err in admitting the statements against James. Nor were James's and Clarke's defenses "mutually antagonistic and irreconcilable." Thus, there was no abuse of discretion in denying the defendant's motion to sever.

*Review pursuant to G. L. c. 278, § 33E.* Both defendants have requested that we exercise our power under G. L. c. 278, § 33E, and order a new trial or enter a verdict of a lesser degree of guilt on the convictions of murder in the first degree. We have reviewed the entire record and conclude that we should not exercise our power under G. L. c. 278, § 33E, in favor of the defendants.

*Judgments affirmed.*