COMMONWEALTH *vs.* WALTER NORRIS
(and five companion cases[1]).

Middlesex. January 9, 2012. - May 4, 2012.

Present: IRELAND, C.J., BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Joint Enterprise. Defense of Others. Firearms. License. Practice,*
*Criminal,* Required finding, Assistance of counsel, Instructions to jury,
Presumptions and burden of proof, Capital case. *Constitutional Law,* As-
sistance of counsel. *Evidence,* Expert opinion. *Deoxyribonucleic Acid.*

At the trial of indictments charging two codefendants with, inter alia, murder
in the first degree, the evidence of one defendant's conduct, considered as
a whole, was sufficient to sustain his conviction as a joint venturer on
theories of deliberate premeditation and extreme atrocity or cruelty, where
the defendant conceded his presence at the scene of the killing; where
there was evidence that he initiated the encounter with the victim, knew
that the codefendant had a gun, and stepped away from the victim, allow-
ing the codefendant to shoot the victim; and where the defendant walked
over and kicked the victim in the face after he had been shot. [137-140]
This court concluded that the failure of counsel for each of two codefendants
at a murder trial to request an instruction on defense of another did not
constitute ineffective assistance, where, although sufficient evidence sup-
ported such an instruction, counsel could have decided for strategic reasons
not to do so. [140-143]
At the murder trial of two codefendants, the judge did not err in declining to
give an instruction on defense of another sua sponte. [143-144]
At a criminal trial, the defendant was not entitled to an instruction that he
could be convicted of unlawful possession of a firearm only if the Com-
monwealth proved beyond a reasonable doubt that he did not have a
license to carry, where the defendant did not meet his burden of producing
evidence he had a license. [145]
This court declined to exercise its power under G. L. c. 278, § 33E, to reduce
a verdict of murder in the first degree or to order a new trial. [145-147]

INDICTMENTS found and returned in the Superior Court Depart-
ment on October 30, 2006, January 24, 2007, and June 15,
2007.

The cases were tried before *Diane M. Kottmyer*, J.

[1]Three against Valentino Facey and two against Walter Norris.

*Ruth Greenberg* for Walter Norris.

*Dana Alan Curhan* for Valentino Facey.

*Anne Pogue Donohue*, Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. The defendants, Walter Norris and Valentino Facey, were convicted of murder in the first degree, as well as related crimes; the murder convictions were based on theories of deliberate premeditation and extreme atrocity or cruelty.[2] The charges concerned the shooting death of Bernard Johnson in the parking lot of a Somerville apartment building. In their appeals, Facey contends that the evidence was insufficient to sustain his murder conviction as a joint venturer; both defendants argue that the jury should have been instructed on defense of another; and Norris claims he was entitled to a jury instruction that one of the elements of possession of a firearm is the lack of a license. We affirm the defendants' convictions and decline to exercise our power to grant relief under G. L. c. 278, § 33E.

1. *Background.* a. *Commonwealth's evidence.* We recite the facts as the jury could have found them at trial, reserving other facts for later discussion. On the night of August 29, 2006, Desire Pires arrived at her cousin Shaline Lavita's apartment in Somerville around 8 P.M. When Pires arrived, Lavita and her friend Tessa Ortiz were there.

About two weeks earlier, Lavita and Ortiz had met the defendant Facey and another man, Tawan Dottin, while driving through Central Square in Cambridge, and had exchanged telephone numbers with them. On the night of August 29, Lavita and Ortiz received telephone calls from Facey and Dottin around 10:30 P.M. asking if the two men could come to Lavita's apartment. The women agreed. Because Facey and Dottin had said they needed a ride, Ortiz and Lavita then drove in Ortiz's car to Cambridge to pick them up. When Ortiz arrived, five or six men, including Facey and Dottin as well as Norris, approached Ortiz's car. The women asked Facey why there were so many men there and who the men were. Facey responded that they were his "boys" or his "crew." After some discussion, Ortiz

---

[2]The Commonwealth also presented the theory of felony-murder in the first degree, but the jury did not find either defendant guilty on that theory.

agreed to, and did, take all the men back to Lavita's apartment in Somerville, although two trips were required.

Around 11:15 P.M., Pires drove from Lavita's apartment to the airport and picked up the victim. He was wearing gold earrings, a long gold chain with a religious medallion, a watch, a bracelet, and two rings. In his mouth, he also had a removable tooth cover made of gold. As Pires was driving away from the airport with Johnson, he pulled out a ring, proposed to Pires, and put the ring on her finger. Pires then drove back to Lavita's apartment and parked in the parking lot at the rear of the apartment building around 12:30 A.M. She saw Lavita and some men she did not recognize on the porch of Lavita's apartment, which was on the third floor of the building. Pires and Johnson walked up the stairs into the apartment, Pires showed off her ring, and she and Johnson stayed in the kitchen talking for about twenty to thirty minutes. Ortiz joined them when she returned to the apartment. Facey, Norris, and Justin Hollis, another of the men who had come to the apartment with Facey, were on the porch for at least part of the time, although Facey spent some minutes in the kitchen with Pires and Johnson, as Facey and Pires knew each other. There were no problems or altercations among the people at the apartment up to this point.

Eventually, Pires and Johnson prepared to leave to go to a hotel in Somerville. Just before Pires was about to walk down the outside stairs to the parking lot, Facey stepped in front of her from the porch and walked down the stairs ahead of her. Facey held the front of his pants, in the waistband area, with one hand as he went down the steps. He stopped at the bottom of the stairs; Pires and Johnson kept walking. Facey then walked past them and told Johnson to "run your chain," which Pires interpreted to mean, "I'm going to take your chain from you."

Pires, who was in front, turned around when she heard this and saw Facey and Johnson holding on to Johnson's gold chain and "tussling" over it. She did not see anyone with a gun at this point. As the men struggled, they moved from the sidewalk into the parking lot between two cars; Pires followed them, urging Facey to stop. Facey was behind Johnson, reaching over his back, as the men continued to fight over the chain. Facey repeat-

edly told Johnson to "give him his shit back."[3] Pires then saw Johnson with a gun in his hand but she did not know where it came from. She had not seen Johnson with a gun on the drive back from the airport or in Lavita's apartment. She had not brought a gun that night or given a gun to Johnson, and he had not asked her to bring one.

Facey yelled up to his friends on the porch to "come help me." Norris and Hollis ran down the stairs. Norris ran straight toward Facey and Johnson, who were standing between two parked cars, holding a gun in his hand and pointing it at them. He stopped within a few feet of the pair. Pires, standing between Norris and Johnson, told Norris not to shoot and tried to keep him from getting involved in the altercation. Hollis ran around one of the cars in the parking lot and told Facey to stop fighting with Johnson.

Facey and Johnson continued to struggle, with Johnson leaning forward holding the gun in his left hand, trying to keep Facey, who was still behind him, from getting the gun. Johnson was right handed. Keeping the gun pointed to the ground, Johnson said, "Get back." He used his right hand to pull back and then release the slide mechanism on the top of the gun, which either loads or unloads a firearm.

Facey then let go of Johnson and "took a few steps back." At that point, Pires was standing between a car and blue van. Norris was on her right side; Facey was to her left. Pires was facing toward Johnson, who had his back to the blue van.

Without pointing his gun at anyone, Johnson said, "I can't believe you just tried to rob me." At that moment, Norris fired his gun six times and Johnson fell to the ground. Johnson sustained gunshot wounds to his head, right lower back, right buttock, left buttock, left elbow, and right wrist. The bullet to his head entered behind his left ear and exited behind his right ear. The wound would have been fatal in and of itself and would

---

[3]There is a dispute as to what this statement meant. The prosecution argued that Facey attempted to rob Johnson with a gun, which Johnson then took from him, and that Facey was demanding that Johnson give him back his gun. However, Norris's counsel argued in closing that Johnson had robbed Facey of a large amount of money, and that Facey was asking Johnson to give him back his money.

cause death immediately or within seconds. The bullet that entered Johnson's right lower back traveled upward from back to front, through his kidney, liver, and lung, and lodged in his right armpit. This wound also would have been independently fatal, but would take longer to cause death than the wound to the head. The wounds to the buttocks both traveled from back to front.

After shooting Johnson, Norris hit Pires in the face and eye with his gun and ran away. Facey walked over to Johnson as he lay motionless on the ground and kicked him in the face. Pires pushed Facey away and told him to stop, and Facey ran.

Pires contacted the police from her cellular telephone. Officer Louis Remigio of the Somerville police department was the first to respond to the scene. Johnson lay on his side in a fetal position, bleeding profusely from the head. He had no vital signs. Johnson also had abrasions on his nose, upper lip, lower lip, and forehead area. An ambulance took Johnson and Pires to Cambridge Hospital, where Johnson was declared dead at 2 A.M. Pires received thirteen stitches for the wound to her eye.

Meanwhile, at approximately 1 A.M., Officer Carlos Melo heard a dispatch on his radio regarding shots fired near Merriam Street, adjacent to his location. He looked in the direction of Merriam Street and saw Facey and Norris walking "rather swiftly" away from that area. He asked the men if he could speak to them for a minute. They looked over at him but continued walking. Melo drew his gun and told Facey and Norris to stop and show their hands. Instead of stopping, they ran. Melo pursued the men but lost sight of them as they ran. He summoned other officers by radio to set up a perimeter around the area. A few minutes later, Officer William Carr of the Somerville police department saw Facey and Norris coming out of a parking lot onto Prospect Street and starting to walk hurriedly toward Cambridge. He apprehended them at the top of the Prospect Street bridge.

While the men were detained, a chemist from the State police crime laboratory took samples of the defendants' clothing, which were tested for both human blood and deoxyribonucleic acid (DNA).[4] The chemist found human blood on Facey's sneakers,

---

[4]Norris moved to suppress evidence seized from him, his statements, and

particularly in the toe areas. Facey's long-sleeve gray T-shirt also had a high velocity impact splatter of blood on it. The splatter contained a mixture of DNA from at least two individuals. Johnson's DNA matched the major profile, while Facey, Norris, and Pires were excluded as contributors. Facey's white T-shirt also had red-brown stains with DNA from at least two people. Johnson matched the major profile in both areas tested.

Three firearms were recovered from the scene and surrounding area. A .38 caliber semiautomatic pistol was found in the parking lot. A live .38 caliber cartridge was found on the ground next to the rear tire of one of the vehicles, between pools of blood and Johnson's gold chain. In addition, there were five live cartridges inside the pistol, which had a capacity of six cartridges. A sample taken from the handle area of the pistol contained DNA from at least three people. Johnson, Facey, and Pires were included as potential contributors; Norris was excluded. A DNA sample taken from the "backstrap" of the pistol was from a single source. It matched Johnson's DNA profile but did not match Facey's, Norris's, or Pires's profile. A fully loaded, working nine millimeter Smith & Wesson semiautomatic pistol also was discovered in the bushes in front of 14-16 Linden Street in Somerville. This weapon's grip was tested for handler DNA, but the results were inconclusive as to Norris, Facey, Johnson, and Pires.

Two days later, on August 31, 2006, around 10 P.M., Steven Hardy, who lived at 10 Linden Street, saw a man get out of his car and walk to Hardy's neighbor's trash barrels, which were at the curb for trash collection. When Hardy went outside and looked into the barrels, he saw a revolver sticking up. The revolver, a Ruger Model Police Security Six, had six discharged cartridge cases in its cylinder. Each bullet recovered from Johnson's body was fired from this revolver. DNA found on the revolver was a mixture of at least two individuals. Both Norris and Facey were included as potential contributors of the DNA; Johnson and Pires were excluded. Neither Norris nor Facey

the results of a showup identification conducted while the defendants were on the bridge. Facey did not file a motion to suppress. Norris's motion was denied after an evidentiary hearing. On appeal, Norris does not challenge the denial of his motion. We have reviewed the transcripts of the hearing and the decision denying the motion and have found no error.

held a license to carry a firearm or a firearm identification (FID) card.

b. *Norris's testimony.* Norris testified at trial; Facey did not. According to Norris, he and Facey had been friends since high school and saw each other regularly. Before arriving at Lavita's that night, Facey had invited Norris to meet him at Dana Park in Cambridge. At the park, Norris smoked marijuana, drank cognac, and talked with Facey and Facey's other friends: Dottin, Hollis, Myles Lockwood, and Daryl Greene.

Turning to the incident in question, Norris stated that he did not hear either Johnson or Facey call for help while he, Norris, was on the porch, but that he came downstairs because he heard a commotion and saw Facey and Johnson struggling. He said that his gun was in its holster at his waist when he came down the stairs toward Facey and Johnson, not in his hand. As he got closer, he noticed that Johnson had a gun. Norris saw Facey separate from Johnson. Hollis told Johnson to put the gun down, but Johnson said, "I'm not a bitch, I'm a shooter," and pointed the gun at Facey. Norris then told Johnson to "chill." Johnson cocked the gun back, saying, "I'm a shooter," and "I'll let her go," and pointed it at Norris. Norris did not want to die, so he took out his gun and fired. When he first fired, he was face to face with Johnson, looking down the barrel of Johnson's gun. Norris stated that he never intended to kill Johnson, but things happened quickly when he pulled the trigger.

c. *Trial.* Norris and Facey were tried together in September, 2008. The jury found each defendant guilty of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty, but not felony-murder; the jury found each guilty of possession of a firearm as well. Facey also was convicted of attempted armed robbery and Norris of assault and battery by means of a dangerous weapon. Before us are the defendants' direct appeals from their convictions. They have not filed motions for a new trial in the Superior Court.

2. *Sufficiency of the evidence: Facey.* The Commonwealth proceeded at trial on the theory that Norris was the principal actor and Facey was guilty of murder in the first degree as a joint venturer. We first address Facey's challenge to the sufficiency of the evidence of joint venture with respect to the charge of

murder. His motion for required findings of not guilty at the close of the Commonwealth's case was denied.[5] At the charge conference held at the close of the evidence, he also objected to the submission of the murder charge to the jury on the theories of deliberate premeditation and extreme atrocity or cruelty. "In reviewing a denial of a motion for a required finding of not guilty, we ask whether, viewing the evidence in the light most favorable to the Commonwealth, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' " (emphasis in original). *Commonwealth* v. *Perez*, 460 Mass. 683, 702 (2011), quoting *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). We review only the evidence presented during the Commonwealth's case-in-chief. See *Commonwealth* v. *Berry*, 431 Mass. 326, 332 (2000).

At the time this case was tried, in order to prove joint venture, the Commonwealth was required to show that Facey was "(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit [the] crime, and (3) by agreement, [was] willing and available to help the other if necessary." *Commonwealth* v. *Zanetti*, 454 Mass. 449, 455 (2009) (*Zanetti*), quoting *Commonwealth* v. *Green*, 420 Mass. 771, 779 (1995).[6] On review, we evaluate whether "the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent

[5]Facey's motion simply requested a finding of not guilty on all the indictments. Ordinarily, "a generally phrased motion for [required findings] does not preserve for review the denial of the motion on a specific theory of liability when there was sufficient evidence to withstand the motion on an alternative theory." *Commonwealth* v. *Berry*, 431 Mass. 326, 331 (2000). However, because Facey argued orally the sufficiency of the evidence as to each theory of murder in the first degree in his argument in support of the motion for required findings, and because he objected again to the inclusion of certain theories in the jury instructions, we treat his objection as preserved and consider whether the evidence was sufficient to submit the case to the jury on both deliberate premeditation and extreme atrocity or cruelty. See *id.* at 331-332.

[6]In addition, to prove a defendant guilty of deliberately premeditated murder in the first degree on a joint venture theory where the other person used a gun, the Commonwealth was required to "establish beyond a reasonable doubt that the defendant knew [the other person] had a gun with him." *Commonwealth* v. *Zanetti*, 454 Mass. 449, 455 (2009), quoting *Commonwealth* v. *Green*, 420 Mass. 771, 779 (1995).

required for that offense." *Zanetti, supra* at 468. See *Commonwealth* v. *Jansen,* 459 Mass. 21, 28-29 n.20 (2011).[7] "The defendant's intent may be inferred from his knowledge of the circumstances and participation in the crime." *Commonwealth* v. *Carnes,* 457 Mass. 812, 823 (2010), citing *Commonwealth* v. *Soares,* 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979).

A defendant must have an intent to kill or cause death to sustain a conviction of murder in the first degree on the theory of deliberate premeditation, while extreme atrocity or cruelty requires that he have "an intent to cause death, to cause grievous bodily harm, or to do an act which, in the circumstances known to the defendant, a reasonable person would have known created a plain and strong likelihood that death would follow." *Commonwealth* v. *Pimental,* 454 Mass. 475, 480 (2009), quoting *Commonwealth* v. *Novo,* 449 Mass. 84, 99 (2007). Thus, if there were evidence presented that Facey intended to kill Johnson, that evidence would suffice to show that Facey had the required state of mind to support a conviction of murder under both theories. See *Commonwealth* v. *Deane,* 458 Mass. 43, 51 (2010).

While Facey admits that he was present at the scene of the crime, he argues that no rational trier of fact could have found that he knew Norris had a gun, that he knew Norris intended to kill Johnson, or that he participated in the killing with shared intent. We disagree. The evidence of Facey's conduct, considered as a whole, was sufficient for a rational jury to find each of these elements. In particular, a jury could infer that Facey initiated the encounter that led to Johnson's killing by using a gun to try to take Johnson's chain from him, and that he continued to struggle with Johnson after losing the gun. Facey then called up to his friends on the porch to ask them to help him in his fight with Johnson. Cf. *Commonwealth* v. *Clarke,* 418 Mass. 207, 215 (1994) (sufficient evidence of joint venture where defendant "instigated" confrontation and sought help from another to retaliate, leading to shooting death of victim). A rational jury could have found that Facey knew that Norris had a gun because DNA consistent with Facey's DNA profile was found on Norris's gun, and Facey had an opportunity to see the

[7]See note 6, *supra.*

gun earlier that evening on the trip from Cambridge to Somerville. Even if the jury did not find that Facey knew of the gun prior to the confrontation, there was sufficient evidence to find that Facey realized Norris had a gun when Norris ran down the stairs and stood nearby with his gun pointed at Johnson, and Pires told Norris not to shoot. Shortly after Norris was in position, Facey stepped away from Johnson, a move made by Facey that the jury reasonably could have inferred was designed to allow Norris to take a shot at Johnson. "The line that separates mere knowledge of unlawful conduct and participation in it, is 'often vague and uncertain. It is within the province of the jury to determine from the evidence whether a particular defendant [has] crossed that line.' " *Commonwealth* v. *Longo*, 402 Mass. 482, 487 (1988), quoting *Commonwealth* v. *Cerveny*, 387 Mass. 280, 287 (1982).

Most tellingly, after Norris shot Johnson six times and Johnson lay on the ground motionless and bleeding from the head, Facey walked over and kicked Johnson in the face, only turning to flee with Norris after Pires pulled him away and told him to stop. Pires's testimony about the kick was corroborated by the medical examiner's testimony about the abrasions on Johnson's face, as well as the blood found on the toes of Facey's sneakers. This kick, considered with the evidence just summarized, clearly permitted the inference that Facey wanted Johnson to die. See *Commonwealth* v. *Pov Hour*, 446 Mass. 35, 43 (2006) (sufficient evidence of malice for murder conviction on theory of extreme atrocity or cruelty where defendant continued to punch and kick victim, who was unresponsive on ground, after codefendant had stopped); *Commonwealth* v. *Johnson*, 425 Mass. 609, 611 (1997) (sufficient evidence of malice where defendant punched and kicked victim, watched joint venturer stab victim, and kicked victim in face as victim lay on floor dying).

3. *Jury instructions.* a. *Defense of another.* Both defendants claim that the judge should have instructed the jury that defense of another is a defense to murder. Neither defendant's counsel requested such an instruction at trial or argued there that Norris shot Johnson in defense of Facey; instead, both counsel argued that Norris acted solely in self-defense. The defendants claim that the failure of their respective trial counsel to request an

instruction on defense of another deprived them of their constitutional right to effective assistance of counsel. Alternatively, the defendants argue that the judge should have given the instruction sua sponte, and her failure to do so created a substantial likelihood of a miscarriage of justice. We address each argument in turn.

In the context of a capital case, we review a claim of ineffective assistance of counsel under G. L. c. 278, § 33E, to determine whether any error created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 681-682 (1992). In particular, we "consider whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." *Id.* at 682.

An actor may use force to defend a third person when "a reasonable person in the actor's position would believe his intervention to be necessary for the protection of the third person, and . . . in the circumstances as that reasonable person would believe them to be, the third person would be justified in using such force to protect himself." *Commonwealth* v. *Martin*, 369 Mass. 640, 649 (1976). See *Commonwealth* v. *Young*, 461 Mass. 198, 208-209 (2012). The evidence at trial was sufficient to support an instruction on defense of another. Norris testified that Facey was standing, unarmed, within a few feet of the armed Johnson. There was no evidence that Norris knew that Facey had initiated the armed robbery of Johnson. The medical examiner testified that the bullets shot by Norris entered Johnson's body from behind, which would permit a reasonable inference that Johnson was turned toward Facey, rather than at Norris, at the time of the shooting. In these circumstances, a reasonable person in Norris's position could believe that his intervention was called for to protect Facey and also that Facey would have been warranted in using deadly force.[8] Given the sufficiency of the evidence, in order to determine whether the failure to request an instruction on defense of another was error, we must consider whether counsel's apparent decision not to request the instruction was "so manifestly unreasonable as to be

---

[8]The Commonwealth conceded at oral argument that the evidence could have supported an instruction on defense of another.

unprotected by the labels of 'trial strategy' or 'trial tactics.' "
*Commonwealth* v. *Smith*, 459 Mass. 538, 554 (2011), quoting
*Commonwealth* v. *Adams*, 374 Mass. 722, 728 (1978).

The defendants argue that there was "no conceivable" tacti-
cal reason not to pursue a claim of defense of another. But
because the defendants have not moved for a new trial, the rec-
ord before this court does not contain any affidavits from defense
counsel. See *Commonwealth* v. *Stewart*, 460 Mass. 817, 833
(2011). "We keep in mind that an ineffective assistance of
counsel challenge made on the trial record alone is the weakest
form of such a challenge because it is bereft of any explanation
by trial counsel for his actions and suggestive of strategy
contrived by a defendant viewing the case with hindsight."
*Commonwealth* v. *Peloquin*, 437 Mass. 204, 210 n.5 (2002).

Based on the trial record, we conclude that counsel for each
defendant could have decided, for strategic reasons, not to request
an instruction on defense of another. One of the theories the
Commonwealth pursued at trial against both defendants was
felony-murder, with the predicate felony being Facey's attempted
armed robbery.[9] By arguing only self-defense, counsel for Nor-
ris was able to distance his client from Facey and to claim more
plausibly that Norris was not assisting Facey in the robbery at-
tempt — a strategy that succeeded, because the jury did not
find Norris guilty of felony-murder. For his part, Facey needed
to disprove the Commonwealth's theory that he was engaged in
a joint venture with Norris to kill Johnson. Accordingly, Facey's
counsel reasonably could decide that Facey would benefit from
avoiding a theory that would have highlighted his close ties to
Norris and thereby strengthened the appearance that the two
were working in tandem to protect one another.

Additionally, a claim of defense of another was inconsistent
with Norris's testimony.[10] Norris's counsel reasonably may have
concluded that advancing a theory of defense that was contra-

---

[9]Although Norris was not charged with the predicate felony of attempted
armed robbery, the Commonwealth nonetheless was entitled to proceed against
him on a felony-murder theory. See *Commonwealth* v. *Stokes*, 460 Mass. 311,
315 (2011).

[10]Norris stated that he shot Johnson while he was standing face-to-face with
Johnson, looking down the barrel of Johnson's gun. He explained that he fired
because he personally did not want to die; he expressed no concern for Facey.

dicted, or least not supported by, the defendant's own words might have invited the jury to disbelieve all of Norris's testimony and thereby undermine Norris's central claim of self-defense. As for Facey, his counsel also might have concluded that, given Norris's testimony eschewing an intent to protect Facey when he fired at Johnson, the realistic possibility of the jury's accepting a theory of defense of another was exceedingly slim. And because a successful theory of self-defense on Norris's part would benefit Facey to the same degree as a successful theory of defense of another — each should result in Facey being found not guilty[11] — counsel might have concluded that it was more advantageous to Facey to proceed with the defense of self-defense because Norris's testimony supported it. In sum, on the present records, the defendants have failed to demonstrate ineffective assistance of counsel.

As for the defendants' second claim, we conclude that on the facts of this case, the judge was not required to give an instruction on defense of another sua sponte. Neither defendant placed any reliance on the theory of defense of another at trial, nor was there any testimony or argument to support the claim that Norris believed Facey was in danger or wanted to protect him. Cf. *Commonwealth* v. *Souza*, 428 Mass. 478, 486 (1998) (upholding judge's decision to give sua sponte instruction on self-defense as proper exercise of discretion, but stating also that judge was not required to give instruction where neither defendant nor Commonwealth requested it); *Commonwealth* v. *Hakkila*, 42 Mass. App. Ct. 129, 130-131 (1997) (no sua sponte instruction on self-defense required where self-defense was not theory on which defendant relied at trial and where defendant's testimony, "indulgently read, [contained] only the germ of concern about

---

[11]In order to convict Facey of murder as a joint venturer, the jury would have to find that Facey had participated in a murder with Norris, the principal. See *Commonwealth* v. *Zanetti*, 454 Mass. 449, 468 (2009). If Norris had succeeded on his claim of self-defense, Facey necessarily would have been acquitted of the murder charge because Norris would only have committed a justified killing, and there would be no murder in which Facey could have participated. See *Commonwealth* v. *Rogers*, 459 Mass. 249, 270, cert. denied, 132 S. Ct. 813 (2011) ("if the defendant engaged in the proper exercise of self-defense, there can be no verdict of murder"). The same would be true with respect to a successful theory of defense of another.

his person").[12] Cf. also *Commonwealth* v. *Woodward*, 427 Mass. 659, 662-663 (1998), quoting *Commonwealth* v. *Gould*, 413 Mass. 707, 715 (1992) (discussing lesser included offense: "We have stated repeatedly that, '[w]hen the evidence permits a finding of a lesser included offense, a judge must, *upon request*, instruct the jury on the possibility of conviction of the lesser crime' " [emphasis added]); *Commonwealth* v. *Roberts*, 407 Mass. 731, 737-739 (1990) (rejecting claim that judge should have instructed on lesser included offense where defense counsel agreed instruction should not be given and instruction was inconsistent with defendant's trial strategy).

The trial judge here would have been required to give an instruction on defense of another had one of the defendants requested it. But if the judge had given such an instruction on her own, she might well have interfered with the defendants' right to present their chosen defenses, because, as discussed, focusing the jury's attention on a claim that Norris was defending Facey could have prejudiced both defendants. Cf. *Commonwealth* v. *Federici*, 427 Mass. 740, 743-746 (1998) (approving judge's decision not to give instruction on lack of criminal responsibility because defendant objected to instruction, although his counsel requested it).[13]

---

[12]But see *Commonwealth* v. *Kivlehan*, 57 Mass. App. Ct. 793, 795 (2003) ("Where the facts of the case permit, a judge is *required* to instruct on that theory *even in the absence of a request from the defendant*" [emphasis added]); *Commonwealth* v. *Galvin*, 56 Mass. App. Ct. 698, 701 (2002) (same). Cf. *Commonwealth* v. *Eberle*, 81 Mass. App. Ct. 235, 241-243 (2012) (failure to instruct on self-defense was prejudicial error where defense counsel requested instruction orally and defendant's testimony relied significantly on self-defense). While it may not be an abuse of discretion for a judge to instruct on a theory of self-defense (or defense of another) that is supported by the evidence even where the defendant has not so requested, we do not agree that as a general matter, a judge is required to do so in the absence of a request for the instruction — at least in a case where the defendant has not relied on or even mentioned the defense at trial. See *Commonwealth* v. *Souza*, 428 Mass. 478, 486 (1998).

[13]Although it was not error, to the extent that the defense was raised by the evidence, it would have been helpful for the judge to confirm with the parties on the record that they were not seeking an instruction on defense of another. See *Commonwealth* v. *Roberts*, 407 Mass. 731, 737 (1990) (approving judge's decision not to give instruction because "the judge raised the issue of a larceny instruction with counsel prior to the instructions, and defense counsel agreed that such an instruction should not be given").

b. *Possession of a firearm: Norris.* Citing Gonzalez *vs.* Dickhaut, U.S. Dist. Ct., Civil Action No. 08-11657 (D. Mass. Nov. 30, 2010), Norris argues that the judge should have instructed the jury that he could be convicted of unlawful possession of a firearm only if the Commonwealth proved beyond a reasonable doubt that he did not have a license to carry. We recently addressed this issue in *Commonwealth* v. *Gouse,* 461 Mass. 787, 802-808 (2012), and reaffirmed that under Massachusetts law, licensure is an affirmative defense, not an element of the crime. See *id.* at 802-803; *Commonwealth* v. *Powell,* 459 Mass. 572, 582 (2011); *Commonwealth* v. *Jones,* 372 Mass. 403, 406 (1977). As such, Norris had the burden of producing evidence that he held a license; if he had done so, the burden would have been on the Commonwealth to prove beyond a reasonable doubt that he did not have one. See *id.* Because he did not produce any such evidence,[14] the Commonwealth was not required to prove that he did not have a license, and thus Norris was not entitled to the requested instruction.

4. *G. L. c. 278, § 33E.* Facey argues that he should be granted a new trial or his murder conviction should be reduced to manslaughter, pursuant to our power under G. L. c. 278, § 33E. Although Norris does not raise a claim seeking relief pursuant to G. L. c. 278, § 33E, the statute obligates us nonetheless to review the entire record of the case in relation to him as well.

a. *Weight of the evidence.* Facey argues that because the evidence of his intent to kill Johnson is "far from overwhelming," we should exercise our power to reduce his conviction to manslaughter — a verdict he claims would be justified on account of his recklessly asking his armed friends to assist him. The evidence fully supported the jury's verdict, and we decline to reduce it.

b. *Improper calculation of percentages by DNA expert.* Although the defendants do not raise the issue on appeal, our

---

[14]In fact, Norris's defense counsel argued in closing, "Now, when you go [to] the jury room, the first thing you can do is convict my client of possession of the firearm because he's guilty of that. And we told you that from the outset of this case. And it shouldn't take you long to figure that out. He didn't have a license. He didn't have permission to carry the gun." Trooper Michael Banks had testified that Norris did not have a license to carry a firearm or a firearm identification card.

review of the record indicates that Leanna Farnam, the chemist from the DNA unit of the State police crime laboratory who testified on behalf of the Commonwealth, made several calculation errors in her conversions of fractions into percentages, and thereby understated the likelihood that a randomly selected individual with no connection to the item could be "included" as a potential contributor to the DNA samples. Specifically, Farnam was asked to testify about the probability that a randomly selected individual would be included as a potential contributor to the DNA mixture found on four items: the Ruger firearm used to kill Johnson; a white "do-rag"; a red shirt; and the .38 caliber gun found next to Johnson's body. As for the Ruger firearm, Farnam testified that both Facey and Norris were included as potential contributors of the DNA. She first gave fractions to represent the probability that a randomly selected individual could be included as a contributor, such as, one in sixty-five of the Caucasian population, one in sixty-four of the African-American population, and one in ninety-nine of the Hispanic population. The prosecutor then asked Farnam to express the same probabilities as percentages.[15] For the Ruger firearm, she stated that approximately 99.985 per cent of the Caucasian population, 99.98 per cent of the African-American population, and 99.99 per cent of the Hispanic population were excluded as the possible source of the DNA found on the item. The correct percentages are 98.46, 98.44, and 98.99, respectively, meaning that Farnam understated the possibility that someone who was selected at random (and not in fact connected to the item) could be included as a contributor by about one per cent.[16]

We conclude, however, that there was no substantial likeli-

---

[15]Farnam provided percentages for the likelihood that a randomly selected person would be either included or excluded as a contributor, both of which were calculated incorrectly, but for our purposes, the percentages with regard to excluding individuals are most relevant.

[16]The error was not lost on the counsel for at least Norris. After two of the items had been discussed, Norris's counsel objected to the testimony and argued at the sidebar that Farnam was incorrectly calculating the percentages. At the judge's request, the prosecutor asked Farnam to explain, in front of the jury, how she had made the calculations. Farnam replied:

"In order to express these statistical calculations as a percentage, I

hood of a miscarriage of justice. The difference of one per cent between the figures given by Farnam and the true figures was unlikely to have substantially influenced the jury's deliberations, because the percentage of the population who were excluded as possible contributors to the DNA remained very high — over ninety-eight per cent — meaning it was still very unlikely that anyone included as a contributor had no connection to the item. Furthermore, the jury had an independent basis to assess the accuracy of Farnam's calculations. They heard her testify to the correct fractions and her method of calculating the percentages. Thus, the jury could have recognized that the percentages were incorrect and used this information to determine the appropriate weight to give her testimony. We discern no basis to order a new trial or reduce verdicts of murder in the first degree for either defendant.

*Judgments affirmed.*

---

simply divided one divided by 136 and that gave me a percentage which indicated the percentage of the population that was included. To obtain the percentage of the population that is excluded, I simply took that percentage that I obtained in the previous calculation. I subtracted that from one hundred and I obtained a percentage for the population that is excluded."

Based on her own testimony, Farnam's calculations were incorrect. She omitted the necessary step of converting the decimal obtained from dividing one by 136 into a percentage by moving the decimal point two places to the right. This error was repeated each time that Farnam testified about the conversion from a fraction to a percentage.

After Farnam gave this explanation, the judge offered to provide a break before cross-examination so that the defense attorneys could review the calculations. Norris's attorney replied that he was "satisfied" and that "the numbers don't matter as to this exhibit [the 'do-rag']."