NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13315

COMMONWEALTH  vs.  CARLOS GUARDADO.


Middlesex.      December 5, 2022. - April 13, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Firearms.  Search and Seizure, Motor vehicle, Probable cause.
    Constitutional Law, Search and seizure, Probable cause,
    Right to bear arms, Burden of proof, Retroactivity of
    judicial holding.  Due Process of Law, Elements of criminal
    offense, Burden of proof.  Probable Cause.  Motor Vehicle,
    Firearms.  License.  Practice, Criminal, Motion to
    suppress, Instructions to jury, Presumptions and burden of
    proof, Retroactivity of judicial holding.  Retroactivity of
    Judicial Holding.



    Indictments found and returned in the Superior Court
Department on June 26, 2019.

    A pretrial motion to suppress evidence was heard by C.
William Barrett, J., and the cases were tried before Paul D.
Wilson, J.

    The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


    Elaine Fronhofer for the defendant.
    Jamie Michael Charles, Assistant District Attorney, for the
Commonwealth.

Patrick Levin, Committee for Public Counsel Services, & Chauncey B. Wood, for Committee for Public Counsel Services & another, amici curiae, submitted a brief.

GAZIANO, J.  In 2019, Boston police officers searched the defendant's vehicle without a warrant after having received a tip from a confidential informant, and discovered in the glove compartment a loaded firearm and a large capacity magazine.  At the time of the search, the vehicle was parked in the parking lot of the business at which the defendant was employed.

Following a jury trial, the defendant was convicted of unlawfully carrying a firearm, unlawfully carrying a loaded firearm, unlawfully carrying ammunition, and unlawfully carrying a large capacity feeding device.  The statute under which the defendant was convicted, G. L. c 269, § 10, contains two exemptions that are relevant here.  First, it exempts anyone who, while in possession of a firearm, is present in or on his or her place of business.  Second, the statute exempts someone who has been issued a firearms license.  At the defendant's trial, the judge did not instruct the jury on either of these exemptions.

In this appeal, the defendant argues that there was no probable cause to search the glove compartment of his vehicle and that the judge erred in not instructing the jury on the two statutory exemptions.  We conclude that there was probable cause

to search the glove compartment, because the search was in response to a tip that was provided by an informant who had demonstrated reliability and who had personal knowledge of the firearm.  We also conclude that there was no error in the judge's decision not to instruct on the place of business exemption, because the evidence was insufficient to establish that the parking lot where the vehicle was found was under the exclusive control of the business where the defendant worked.

We agree, however, that the judge erred in not instructing the jury on the licensure exemption.  In the wake of the United States Supreme Court's decision in New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111, 2122 (2022), in which the Court held that the Second Amendment to the United States Constitution protects an individual's right to carry a firearm in public, our existing precedent that licensure is an affirmative defense, and not an element of the offense the Commonwealth is required to prove, must be revisited.  See Commonwealth v. Gouse, 461 Mass. 787, 807 (2012).  Because possession of a firearm in public is constitutionally protected conduct, in order to convict a defendant of unlawful possession of a firearm, due process requires the Commonwealth prove beyond a reasonable doubt that a defendant did not have a valid firearms license.  Accordingly, the defendant's convictions of unlawful possession of a firearm, unlawful possession of a loaded firearm, and unlawful possession

of ammunition cannot stand.  Because there is no constitutional right to possess a large capacity magazine, we affirm the defendant's conviction of unlawful possession of a large capacity feeding device.  See Commonwealth v. Cassidy, 479 Mass. 527, 540, cert. denied, 139 S. Ct. 276 (2018), quoting District of Columbia v. Heller, 554 U.S. 570, 625 (2008) (right to bear arms "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes").[1]

1.  Background.  a.  Motion to suppress.  We recite the facts from the motion judge's findings, supplemented by other evidence in the record that supports the judge's conclusion and that was either explicitly or implicitly credited by the judge. See Commonwealth v. Jones-Pannell, 472 Mass. 429, 437-438 (2015).

On January 25, 2019, Lieutenant Mathew Pieroway of the Boston police department received information from a confidential informant, known as "Z," that an individual with the defendant's name was in possession of an unlicensed gun.  At that point in time, Z was a "card-carrying" informant, which meant that Z had assisted Boston police in an investigation within the previous six months.  In the prior year, information

_____

[1] We acknowledge the amicus brief submitted by the Committee for Public Counsel Services and the Massachusetts Association of Criminal Defense Lawyers in support of the defendant.

provided by Z in one instance had resulted in the seizure of narcotics and an arrest for a drug-related offense, and in a separate matter, Z had provided information that led to the recovery of a firearm that was stored near a playground.

Z informed Pieroway that the individual was in possession of a silver firearm and that the firearm was being stored in a black backpack in his vehicle. Pieroway was aware, from prior conversations with Z, that the individual operated a green Honda Accord with a Maine registration plate. Pieroway also knew the plate number. Z told Pieroway that the individual would be driving in the area of Watertown, in such a vehicle, later that day. Z also reported that the individual worked at a particular auto parts store, hereinafter referred to as "the Store."

While driving toward Watertown, Pieroway contacted other members of his unit, as well as Watertown police Detective Mark Lewis, whom Pieroway knew from prior investigations and prosecutions. Pieroway informed these officers that he had received information from a reliable informant that the defendant had a gun in his possession and that he would be in the Watertown area shortly.

Within an hour of speaking to the informant, Pieroway located the defendant a short distance from a mall in Watertown. Pieroway watched the defendant pull into the parking lot of the Store, get out of the green Honda with the Maine license plate,

and enter the Store, where he appeared to be an employee.  Other officers, including Lewis, arrived soon thereafter and set up surveillance around the car and the Store.  While en route to Watertown, Lewis had had a license check conducted through Criminal Justice Information Services, which had revealed that the defendant did not have a license to carry a firearm, as well as a Criminal Offender Record Information check, which had indicated that the defendant had a prior firearm "incident" on his record.[2]

At roughly 6:45 P.M., Pieroway observed the defendant leave the Store and walk towards his vehicle.  As the defendant was beginning to get into the vehicle, officers approached him, identified themselves, and asked him to move away from it.  They also gave the defendant the Miranda warnings.  Lewis searched the vehicle while the defendant stood with an officer to the rear of it.  Lewis was unable to locate either a gun or a black backpack in the vehicle.  The glove compartment, which was the only part of the interior that was not searched at that time, was locked.  Lewis then conducted a patfrisk of the defendant and found nothing other than the keys to the vehicle.  Lewis used the keys to open the glove compartment.  Inside was a

---

[2] By the time of the hearing on the defendant's motion to suppress, Lewis could not recall anything about the nature of the incident or whether it had resulted in a conviction.

silver Smith & Wesson nine millimeter firearm that was loaded with a fifteen-round magazine containing two rounds of ammunition.  Also inside was another fifteen-round magazine that was loaded with ten rounds of ammunition.

When the defendant left the Store, Detective Sergeant John Claflin, one of the officers who had been surveilling the scene, was told to go into the Store to find out whether the defendant had left any personal belongings, in particular a black backpack, behind.  After entering the Store and having been directed to an employee storage area, Claflin saw a black backpack that was identified by a Store employee as belonging to the defendant.  Claflin picked up the backpack and could feel what he believed, on the basis of his experience and training, to be a gun storage box.  Claflin opened the backpack and found an empty gun storage box.  Claflin left the Store and saw the green Honda being searched; at that point, the defendant had not yet been pat frisked.[3]

Once the gun and magazine were found, the defendant was placed under arrest.  Shortly thereafter, he said, "You got me

---

[3] John Claflin testified at the hearing that he did not think that the gun in the glove compartment had been found when he left the Store.  The defendant contests this statement and argues that it was not established at the hearing on his motion to suppress whether the backpack was searched prior to the discovery of the firearm.  This question of timing is not pertinent to our analysis.

for the gun. It's a [nine millimeter] and there shouldn't be one in the chamber." At the police station, the defendant again was given the Miranda warnings. He agreed to talk to police and told them that he had purchased the firearm for $650 from someone in Quincy and that he had been in possession of the gun for "awhile."

In June 2019, a grand jury issued indictments charging the defendant with one count of illegal possession of a firearm, G. L. c. 269, § 10 (a); two counts of illegal possession of a large capacity feeding device, G. L. c. 269, § 10 (m); one count of illegal possession of ammunition, G. L. c. 269, § 10 (h); and one count of illegal possession of a loaded firearm, G. L. c. 269, § 10 (n).[4]

In December 2019, the defendant filed a motion to suppress any evidence seized as a result of the search and seizure of his vehicle and person, on the grounds that he did not consent to a search of his person or of his automobile and the searches and seizure were in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.

---

[4] Illegal possession of a loaded firearm, under G. L. c. 269, § 10 (n), is not an independent charge but, rather, "constitute[s] further punishment of a defendant who also [has] been convicted under G. L. c. 269, § 10 (a)." See Commonwealth v. Tate, 490 Mass. 501, 520 (2022).

At an evidentiary hearing on the motion to suppress, testimony was presented concerning the basis of Z's knowledge of the firearm.  The prosecutor asked Pieroway whether "Z had actually seen [the] silver firearm that he or she described to you?"  Pieroway responded that "Z had."  Defense counsel objected and asked, "Was the officer there when Z saw the firearm?  Did Z say he saw the firearm?."  The motion judge, who was not the trial judge, commented, "That's fair," and asked whether Pieroway had learned that Z had seen the firearm "through a conversation."  The prosecutor then asked Pieroway, "And how were you made aware that Z had seen the firearm?"  Pieroway answered, "I had asked Z is the firearm real."  The prosecutor inquired, "And what was Z's response?"  Pieroway said, "Yes."  The judge ultimately denied the defendant's motion to suppress.

b.  <u>Trial</u>.  A jury trial took place before a different Superior Court judge in June of 2021.  At trial, witnesses were questioned repeatedly regarding the nature of the parking lot in which the defendant's vehicle had been parked.  On cross-examination of Lewis, defense counsel asked whether Lewis had seen the defendant assisting a customer in the parking lot.  Lewis responded that other investigators had observed the defendant doing so.  At another point, defense counsel asked Lewis to confirm that the green Honda was not parked in the

parking lot of a nearby business across the street from the Store. Lewis responded, "Well, it's not across the street, it's connected to that parking lot. . . . There's no street that . . . intersect[s] . . . . It's one park -- it's a parking complex." Counsel then asked whether the vehicle was parked at "the [Store] parking spot." Lewis responded, "Yes." Similarly, during cross-examination of Pieroway, counsel asked whether the defendant had pulled into "a [Store] parking spot." Pieroway responded that that was correct. Boston police Officer Jason Nunez, another officer who had been at the scene, testified that the defendant's vehicle was parked in "the parking lot of the [Store]." When the prosecutor asked Nunez whether it was a large parking lot, Nunez responded, "I'm not sure the exact amount of spaces but it's definitely -- [twenty] plus vehicles maybe."

After the Commonwealth rested, the defendant moved for a required finding of not guilty on each of the charges. On the first charge, illegal possession of a firearm, the defendant argued that the statute under which he had been charged contained an exemption for possession while "being present in or on his residence or place of business," G. L. c. 269, § 10 (a) (1), and that the Commonwealth had proved only that he had possessed a firearm while "working at his place of business and on the property (i.e.[,] parking lot) of his place of

business."[5]  The prosecutor responded that the defendant did not have the firearm on his person while he was working, but, rather, it was in his vehicle, which "was not in the [Store] area, [nor was it] in [a Store] employee-only spot. . . . [S]everal witnesses testified it was a fairly large parking lot for lots of businesses."  The judge noted that he found the prosecutor's argument "persuasive," and denied the defendant's motion.

In his closing argument, defense counsel said, "In terms of the first indictment, one of the things that [the prosecutor has] to prove is that [the firearm possession] was outside somebody's home or place of business."  During a sidebar following closing arguments, the prosecutor argued that defense counsel had misstated the law.  The judge agreed, stating, "I made a ruling on the [motion for a required finding of not guilty] that I don't think one can reasonably interpret the law to cover this factual situation, because the law about being on or in your business was not meant to apply under these facts."  The prosecutor, however, did not object to the closing argument.

After further discussion at sidebar, defense counsel told the judge that he had just re-read the model jury instructions on possession of a firearm without a license outside an

---

[5] The defendant's arguments with respect to the remaining charges are not relevant to any issue on appeal.

individual's home or business and that the instruction provided states that "if there is evidence that [the possession occurred in] the defendant's residence or place of business," then the judge should instruct the jury that an additional element of the crime is that "the [d]efendant possessed the firearm outside of his place of business." Counsel said that he "did offer evidence that [the firearm possession] was [at the defendant's] place of business." Accordingly, counsel argued that an instruction should be given to the jury. The judge denied the request on the ground that it was untimely, because the jury were about to enter the court room to hear the final charge. The judge also noted that the statute did "not cover the factual situation before this jury, because the Legislature, in putting those words into the statute, did not intend to cover this situation of a . . . firearm in a locked glove box of a car parked in a parking lot, not in the business itself." Defense counsel responded, "I just want to make clear that I did offer evidence through cross-examination that this was strictly [a Store] parking lot, and I think it was thoroughly covered that [the vehicle was in the defendant's] possession . . . . It was in the glove box, for which the keys were found . . . [in] his possession. That's his place of business. I want to make that clear." The judge stated, "Fair enough. Noted." In his final charge, the judge instructed:

"Indictment Number 1 charges [the defendant] with knowingly possessing a firearm unlawfully. In order to prove the Defendant guilty of this offense the Commonwealth must prove the following three things beyond a reasonable doubt. First, that the Defendant possessed a firearm or that he had a firearm under his control in a vehicle. Second, that what the Defendant possessed or had under his control in a vehicle met the legal definition of a firearm. And third, that the Defendant knew he possessed a firearm or had a firearm under his control in a vehicle."

Soon after the jury began deliberations, they submitted a note asking:

"In their closing arguments, the Defense lawyer mentioned that firearm possession, Indictment Number 1, must meet the criteria of being 'outside a home or business.' This is not indicated in your written instructions to us. Can you please clarify if we need to consider this in our deliberations."

Following a discussion, the attorneys and the judge came to an agreement on how the judge would respond to the question. The judge had the jury return to the court room and explained,

"Yes, the statute has an exemption in it . . . for having a weapon at home or at work. However, earlier in this case, outside of your hearing, as a matter of law, I ruled that that exemption does not apply in this case. It's not available to [the defendant]. And therefore that's why I didn't include anything about it in the instructions."

The jury found the defendant not guilty of one count of illegal possession of a large capacity feeding device and guilty of all other counts. The defendant filed a timely notice of appeal, and we transferred the case to this court on our own motion.

2. <u>Discussion</u>. The defendant argues that police did not have probable cause to search the glove compartment of his

vehicle and, thus, the motion judge erred in denying his motion to suppress evidence seized as a result of the warrantless search of his vehicle and person.  The defendant also argues that the trial judge erred in not instructing the jury on the place of business exemption.  In addition, the defendant maintains that the trial judge erred by not instructing the jury that the Commonwealth was required to prove beyond a reasonable doubt that the defendant did not have a firearms license when the firearm and magazine were discovered.

a.  Motion to suppress.  "In reviewing the denial of a motion to suppress, we accept the judge's findings of fact absent clear error" (citation omitted).  Commonwealth v. Mubdi, 456 Mass. 385, 388 (2010).  In particular, we accord deference to "findings drawn partly or wholly from testimonial evidence." Commonwealth v. Tremblay, 480 Mass. 645, 655 (2018).  "We then conduct an independent review of [the judge's] ultimate findings and conclusions of law" (quotation and citation omitted). Mubdi, supra.

A warrantless search is presumed to be unreasonable under the Fourth Amendment and art. 14 of the Massachusetts Declaration of Rights.  Commonwealth v. Ortiz, 487 Mass. 602, 606 (2021).  This presumption, however, may be surmounted "if the circumstances of the search fall within an established exception to the warrant requirement" (citation omitted).  Id.

"One of those exceptions, commonly known as 'the automobile exception,' applies to situations where the police have probable cause to believe that a motor vehicle parked in a public place and apparently capable of being moved contains contraband or evidence of a crime" (citation omitted). Commonwealth v. Dame, 473 Mass. 524, 536, cert. denied, 580 U.S. 857 (2016). This exception exists because "the inherent mobility of automobiles creates an exigency that they, and the contraband there is probable cause to believe they contain, can quickly be moved away while a warrant is being sought." Ortiz, supra, quoting Commonwealth v. Motta, 424 Mass. 117, 123 (1997).

To establish that a search falls within the automobile exception, "[t]he Commonwealth bears the burden of proving the existence of . . . probable cause to believe that the automobile contained contraband" (quotation and citation omitted). Commonwealth v. Garden, 451 Mass. 43, 47 (2008). To meet this burden, the Commonwealth must establish that "the information possessed by police, at the time of the proposed warrantless search, provide[d] a substantial basis for the belief that there [was] a timely nexus or connection between criminal activity, a particular person or place to be searched, and particular evidence to be seized" (citation omitted). Dame, 473 Mass. at 536-537. Probable cause does not require an absence of uncertainty; rather, we ask whether a "reasonable and prudent"

person could have acted on such a belief.  See Commonwealth v. Agogo, 481 Mass. 633, 637 (2019), quoting Commonwealth v. Cast, 407 Mass. 891, 895-896 (1990).

i.  Aguilar-Spinelli test.  The defendant contends that the motion judge erred in allowing the confidential informant's tip to be used to establish probable cause.  An informant's tip may be used to establish probable cause only if the Commonwealth satisfies the Aguilar-Spinelli test.  Commonwealth v. Tapia, 463 Mass. 721, 729 (2012).  See Spinelli v. United States, 393 U.S. 410, 415 (1969); Aguilar v. Texas, 378 U.S. 108, 114 (1964).  This test requires the Commonwealth to "demonstrate some of the underlying circumstances from which (a) the informant gleaned his information (the 'basis of knowledge' test), and (b) the law enforcement officials could have concluded the informant was credible or reliable (the 'veracity' test)" (citation omitted).  Tapia, supra.  "Both prongs must be separately considered and satisfied" (quotation and citation omitted).  Id.  According to the defendant, the Commonwealth failed to satisfy either prong of the Aguilar-Spinelli test.  The Commonwealth maintains that both prongs were satisfied.

The Commonwealth can satisfy the basis of knowledge prong by showing that "the information provided [by an informant] springs from [the] informant's firsthand observations or knowledge."  Commonwealth v. Arias, 481 Mass. 604, 618 (2019).

Here, the motion judge found that Z had told Pieroway that he had seen the firearm in the black backpack, and that that was the basis for his knowledge of the location of the firearm. This finding would be sufficient to satisfy the basis of knowledge prong, as it establishes that "the informant was reporting his own observation of the gun[] in question." See Commonwealth v. Alfonso A., 438 Mass. 372, 374 (2003). The defendant argues, however, that the judge's finding was clearly erroneous.

According to the defendant, a reasonable fact finder could not have found, on the basis of Pieroway's testimony, that Z had had firsthand knowledge of the firearm in the backpack. This is so, the defendant maintains, because Pieroway's later statement that Z told him the firearm was "real" supplanted Pieroway's earlier statement that Z had said he had seen the firearm. The defendant argues, therefore, that the Commonwealth did not demonstrate how "the informant gleaned [the] information" that he reported to Pieroway. See Tapia, 463 Mass. at 729.

"A judge's finding is clearly erroneous only where there is no evidence to support it or where the reviewing court is left with the definite and firm conviction that a mistake has been committed" (quotation and citation omitted). Commonwealth v. Colon, 449 Mass. 207, 215, cert. denied, 552 U.S. 1079 (2007). In reviewing the judge's findings, we recognize that "[t]he

determination of the weight and credibility of the testimony is the function and responsibility of the [motion] judge who saw the witnesses, and not this court" (citation omitted). Commonwealth v. Isaiah I., 448 Mass. 334, 337 (2007), S.C., 450 Mass. 818 (2008). Accordingly, a motion judge is "not required to discard testimony that appears to contain internal inconsistences, but may credit parts of a witness's testimony and disregard other potentially contradictory portions." United States v. González-Vélez, 587 F.3d 494, 504 (1st Cir. 2009), quoting United States v. Lara, 181 F.3d 183, 204 (1st Cir.), cert. denied, 528 U.S. 979 (1999). "The burden is on the appellant to show that a finding is clearly erroneous." Pointer v. Castellani, 455 Mass. 537, 539 (2009).

We conclude that the motion judge's findings here were not clearly erroneous. Pieroway testified that after he was asked to clarify how he knew that Z had seen the firearm, Z had said the firearm was "real." In this context, it was reasonable for the judge to infer that Z knew the firearm to be real because he had seen the firearm. See Commonwealth v. Carr, 458 Mass. 295, 303 (2010) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous" [citation omitted]). There was no clear error in the judge's decision to draw such an inference. See Colon, 449 Mass. at 224 (no clear error where factual findings "were

supported by the evidence admitted or based on logical inferences drawn therefrom").

The defendant also argues that, even if there were a basis of knowledge for the informant's tip, that basis was negated once police failed to find a backpack in the defendant's vehicle, at which point the informant's tip was proved inaccurate by the absence of a backpack. See Mubdi, 456 Mass. at 397. This argument misses the mark. The Commonwealth can establish a basis of knowledge under the Aguilar-Spinelli test through two independent means. First, an informant's basis of knowledge can be inferred if there was sufficient "independent police corroboration of the details of the informant's tip." Commonwealth v. Bakoian, 412 Mass. 295, 298 (1992). Second, the informant's basis of knowledge can be established where it is "apparent that the informant was reporting his own observation." Alfonso A., 438 Mass. at 374. Here, we rely on the motion judge's finding that the informant personally had observed the firearm in the defendant's backpack. The basis of knowledge test therefore survives the police failure to corroborate certain details in the informant's tip. See Tapia, 463 Mass. at 729 ("First-hand receipt of information through personal observation satisfies the basis of knowledge prong . . ." [citation omitted]).

The defendant also contends that the Commonwealth failed to satisfy the veracity prong of the Aguilar-Spinelli test. "To satisfy the veracity test, the Commonwealth needs to show either that the [informant] had a demonstrated history of reliability, . . . or the existence of circumstances assuring trustworthiness on the particular occasion of the information's being furnished" (quotation and citation omitted). Commonwealth v. Pinto, 476 Mass. 361, 365 (2017). A history of reliability can be demonstrated by a showing that "the informant provided accurate information in the past as to seizures, pending cases, convictions, or other such information which would indicate reliability." Commonwealth v. Warren, 418 Mass. 86, 89 (1994).

We conclude that the Commonwealth satisfied the veracity prong. Z's reliability was established by a previous instance in which Z supplied "information [that] led to the confiscation of illegal narcotics." See Commonwealth v. Mendes, 463 Mass. 353, 365 (2012). The defendant argues that one such occasion is insufficient to satisfy the veracity test.[6] To support this

---

[6] The motion judge found that the information Z provided to Boston police had resulted in two separate arrests. The defendant argues that this was clear error because, in his testimony, Pieroway referred to only one arrest that was made on the basis of information provided by Z. We agree. Accordingly, we base our analysis on Pieroway's testimony in which he stated that Z's information led to a drug-related arrest, along with the seizure of narcotics and, separately, the recovery of a firearm near a playground. The defendant further contends that

proposition, he points to Commonwealth v. Melendez, 407 Mass. 53, 59 (1990), in which we stated that "[t]he fact that the informant gave information on one occasion in the past which led to the arrest of two individuals is insufficient to satisfy the veracity test."  In Melendez, however, the issue was not that the informant had only provided information on one occasion. Rather, the veracity test failed in that case because the fact of the arrests, without more, did not establish the accuracy of the information that had caused police to make those arrests. See Commonwealth v. Perez-Baez, 410 Mass. 43, 46 (1991) ("a clerk-magistrate [is] not entitled to infer from . . . a statement [that a prior tip led to arrests] that [the] prior tip had proved to be accurate").  Here, Z supplied information that led not only to an arrest for a drug-related offense, but also to the seizure of narcotics.  The seizure was sufficient proof that Z had "provided information in the past which has proved to be accurate."  See id. at 45.

  ii.  Probable cause to search the glove compartment.  The defendant argues that, even if Z's tip satisfied the Aguilar-Spinelli test, it did not establish probable cause to search the

_____

the discovery of the firearm near the playground did not bolster Z's reliability, because no testimony was given as to whether the firearm was an instrument of unlawful activity.  Because we conclude that veracity is established here on the basis of the seizure of narcotics, we do not address this argument.

glove compartment of his vehicle.  According to the defendant, it would not have been reasonable for police to expect to find his backpack in the glove compartment.

Where there is probable cause to search a vehicle, "the permissible scope of the search [is] not limitless."  Garden, 451 Mass. at 50.  Rather, "a valid search is limited to 'any area, place, or container reasonably capable of containing the object of the search.'"  Id. at 51, quoting Commonwealth v. Signorine, 404 Mass. 400, 405 (1989).  Hence, in determining whether the warrantless search of a vehicle was lawful, we ask whether the search was restricted to the "part[s] of the vehicle where there [was] probable cause to believe the object may be found."  See Commonwealth v. Davis, 481 Mass. 210, 220 (2019).

We begin by considering whether Lewis had probable cause to conduct his initial search of the vehicle.  Lewis was made aware, on the basis of a tip from a reliable informant with firsthand knowledge, that the defendant was in possession of a firearm that day.  See Cast, 407 Mass. at 897, 900-901.  Contrast Commonwealth v. Hart, 95 Mass. App. Ct. 165, 167-168 (2019) (no timely nexus between informant's observation of firearm and location to be searched because firearm was observed two months before search warrant application).  The informant had asserted that the firearm would be in the defendant's vehicle and had identified the make, model, and registration

plate of the vehicle. See Cast, supra at 901-902, quoting United States v. Ross, 456 U.S. 798, 813 (1982) ("the police must have probable cause to believe a particular automobile contains contraband, not just probable cause regarding a specific container whose relationship to an automobile is 'purely coincidental'"). Moreover, based on the license check he conducted prior to encountering the defendant, Lewis had reason to believe that the defendant did not have a license to carry a firearm. Contrast Commonwealth v. Alvarado, 423 Mass. 266, 269 (1996), quoting Commonwealth v. Toole, 389 Mass. 159, 163-164 (1983) ("mere possession of a handgun [is] not sufficient to give rise to a reasonable suspicion that the defendant was illegally carrying that gun"). Lewis therefore had sufficient basis to "warrant a prudent [person] in believing that the defendant had committed, or was committing, an offense" and that evidence of that offense would be found in the identified vehicle (citation omitted). See Commonwealth v. Hernandez, 473 Mass. 379, 383 (2015).

Once Lewis failed to find the firearm during his initial search of the vehicle, there existed probable cause to search the glove compartment, where a firearm readily could be concealed. "[I]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of

the search." See Commonwealth v. Moses, 408 Mass. 136, 145 (1990), quoting Ross, 456 U.S. at 825. Up to an hour had elapsed between the time that Z informed police of the existence of the firearm and when they located the defendant driving in Watertown. The defendant therefore had had ample time to move any firearm in his possession to the glove compartment of his vehicle. See Cast, 407 Mass. at 902 (probable cause existed to search entire vehicle because, after watching defendant place contraband in trunk of vehicle, agents "lost the defendant from their sight . . . for some six hours before he reappeared in view[,] . . . at any point during which [contraband] could have been placed elsewhere in the car"). Moreover, the defendant had parked his vehicle in a public lot outside his workplace. Under such circumstances, it would have been reasonable to suspect that the defendant might have secured an unlawfully possessed firearm in a locked glove compartment in order to avoid its detection by passersby. Contrast Garden, 451 Mass. at 51 ("The search of the [defendant's] trunk . . . exceeded the permissible scope of the search because [the officer] could not reasonably have believed that the source of the smell of burnt marijuana would be found in the trunk").

The defendant maintains that, when officers are apprised that a precise location within a vehicle contains contraband, they must limit their search of the vehicle to that location.

Because the informant's tip specified a particular location -- the defendant's backpack -- in which the firearm would be found, the defendant contends that the scope of a lawful search was limited to areas in which the backpack reasonably could be stored and that it would not have been reasonable to suspect that the backpack would be stored in the glove compartment. This argument, however, misconstrues our jurisprudence. Where an informant's tip specifies a particular location within a vehicle in which contraband may be stored, that does not necessarily preclude the possibility that there is probable cause to search for the contraband in another part of the vehicle. See Commonwealth v. Wunder, 407 Mass. 909, 913 (1990).

Here, Lewis reasonably could have believed that the object of his search -- the silver firearm described by Z -- was located in the glove compartment. See Cast, 407 Mass. at 896, quoting Commonwealth v. Alessio, 377 Mass. 76, 82 (1979) ("in determining whether probable cause exists . . . , '[r]easonable inferences and common knowledge are appropriate considerations'"). As discussed, there was probable cause to believe that the firearm was in the defendant's vehicle. See Bostock, 450 Mass. 616, 624 (2008), quoting Cast, supra at 908 ("As a general matter, . . . the 'lawful warrantless search of a motor vehicle . . . extends to all containers, open or closed, found within"). The defendant had had ample opportunity to

transfer the firearm to the glove compartment, and reason to do so given the public location of the vehicle.  See Garden, 451 Mass. at 50 (officer had probable cause to search glove compartment of vehicle because "any contraband hidden on the passengers' person[s] easily could have been transferred to a location in the passenger compartment when they were ordered to get out").  Accordingly, we conclude that Lewis had probable cause to search the glove compartment of the defendant's vehicle.

iii.  Patfrisk.  The defendant argues that, even if there was probable cause to search the glove compartment, the firearm and magazine should have been excluded at trial because their discovery resulted from an unconstitutional patfrisk of his person.  We conclude that Lewis's search of the defendant's person was a lawful patfrisk and that, thus, the exclusionary rule did not prohibit the introduction of the firearm and magazine.  See Commonwealth v. Long, 476 Mass. 526, 535-536 (2017).

A patfrisk is a "'carefully limited search of the outer clothing of [a] person[] . . . to discover weapons' for safety purposes."  Commonwealth v. Torres-Pagan, 484 Mass. 34, 36 (2020), quoting Terry v. Ohio, 392 U.S. 1, 30 (1968).  "The only legitimate reason for an officer to subject a suspect to a patfrisk is to determine whether he or she has concealed weapons

on his or her person." Torres-Pagan, supra at 39. For this reason, a "patfrisk is permissible only where an officer has a 'reasonable suspicion,' based on specific articulable facts, 'that the suspect is [both] armed and dangerous.'" Commonwealth v. Garner, 490 Mass. 90, 92 (2022), quoting Torres-Pagan, supra at 36.

The motion judge found that Lewis conducted a patfrisk of the defendant because he was "in fear for his safety due to the potential presence of a gun." The defendant points out that there was no testimony suggesting that Lewis feared for his safety when he conducted the patfrisk. If an officer has reasonable suspicion that a person is carrying an illegal firearm, however, that is a sufficient basis upon which to conclude that the person is armed and dangerous so as to justify a patfrisk. See Commonwealth v. DePeiza, 449 Mass. 367, 371 (2007).

The defendant also argues that there was no basis to believe that he was carrying an unlicensed firearm on his person, because Z's tip indicated only that a firearm would be found in his vehicle. See DePeiza, 449 Mass. at 374. Reasonable suspicion, however, may be grounded in "reasonable inferences" drawn from "specific, articulable facts" (citation omitted). Id. at 371. As discussed, Lewis had probable cause to believe that the defendant was in unlawful possession of a

firearm. Just as Lewis reasonably could have inferred, upon failing to find the firearm elsewhere in the vehicle, that it was in the glove compartment, he also reasonably could have inferred that the firearm instead was located on the defendant's person. See Gouse, 461 Mass. at 793 ("When the firearm [that the police had been warned the defendant likely carried] was not found on the defendant's person, police appropriately concluded that it was likely located in the automobile").

Moreover, Lewis was justified in removing the set of keys from the defendant's person and using them to unlock the glove compartment. In order to "dispel reasonable suspicions that the stopped suspect may be armed with a weapon," an officer may retrieve from the suspect any "hard object" that could be a "potential weapon." See Commonwealth v. Pagan, 440 Mass. 62, 68-69 (2003). We previously have held that it is "self-evident" that keys constitute a hard object that may be seized as a potential weapon. See Commonwealth v. Blevines, 438 Mass. 604, 608 (2003). Lewis therefore was justified in retrieving the defendant's keys as a means of disarming him. See Commonwealth v. Wilson, 441 Mass. 390, 396 (2004). In addition, because there was probable cause to believe that the firearm was in the glove compartment, Lewis also was justified in using the keys, once retrieved, to gain access to the interior of the glove compartment. Contrast Blevines, supra at 609-610 (police were

not permitted to use keys seized from defendant during patfrisk to unlock his vehicle because there "was no evidence that the police had any basis for suspecting that any contraband . . . would be found in the automobile").

b. Instruction on place of business exemption. The defendant contends that the trial judge should have instructed the jury that, to convict the defendant, the Commonwealth had to prove that he was not in or on his place of business when the firearm and magazine were discovered. This is because, the defendant argues, whether he was in or on his place of business at the time the firearm was seized was a question for the jury. "Trial judges have considerable discretion in framing jury instructions . . ." (quotation and citation omitted). See Commonwealth v. Kelly, 470 Mass. 682, 688 (2015). "Instructions that convey the proper legal standard, particularly when tracking model jury instructions, are deemed correct." Green, petitioner, 475 Mass. 624, 629 (2016).

General Laws c. 269, § 10 (a), "makes it an offense to 'knowingly' possess a firearm outside of one's residence or place of business without also having a license to carry a firearm." Commonwealth v. Powell, 459 Mass. 572, 588 (2011), cert. denied, 565 U.S. 1262 (2012). We have held that this language exempts an individual from the requirement of obtaining a firearms license if the location of the individual's firearm

is restricted to his or her residence or place of business.  See Commonwealth v. Harris, 481 Mass. 767, 780 (2019).  "We treat the existence of a statutory exemption as equivalent to an affirmative defense."  Commonwealth v. Kelly, 484 Mass. 53, 67 (2020).

While the Commonwealth carries the burden of proving each element of a charged crime, it "has no burden of disproving an affirmative defense unless and until there is evidence supporting such defense."  Commonwealth v. Cabral, 443 Mass. 171, 179 (2005).  If a defendant raises a defense that is "supported by sufficient evidence," however, the defendant is "entitled to have a jury instruction" on that defense.  Id. Where a judge does not instruct the jury on an affirmative defense, the judge errs "if the evidence, viewed in the light most favorable to the defendant, provided support for the affirmative defense."  Kelly, 484 Mass. at 67.

The defendant does not ask us to upend our established precedent that the place of business exemption is an affirmative defense, and we discern no compelling reason to do so.  Here, therefore, the judge erred in not instructing on the place of business exemption only if sufficient evidence was introduced that the defendant was in or on his place of business when the firearm was discovered.  See Commonwealth v. Dunphy, 377 Mass. 453, 459-460 (1979) (if no evidence is provided that defendant

was "within the limits of his property or residence at the time of the alleged offense . . . , it should be presumed that none existed").[7]

To determine whether sufficient evidence was introduced that the defendant was in or on his place of business, we first must delineate the extent of the "place of business" exemption, which we have not yet been required to address. We start by examining the related exemption for place of residence, which we previously have addressed. See Commonwealth v. Anderson, 445 Mass. 195, 214 (2005). We have understood the residence exemption in accordance with the Legislature's intent to balance an individual's interest in self-defense and the public's interest in crime deterrence and public safety. See Commonwealth v. Seay, 376 Mass. 735, 741-743 (1978). With these differing interests in mind, we have reasoned that "[t]he interest of an apartment dweller in defending him[- or her]self . . . is clearly attenuated when he [or she] passes his [or her] doorway to enter a common area offering easy retreat."

---

[7] The model jury instructions on possession of a firearm without a license outside an individual's home or business state that, "[i]f there is evidence that [the firearm possession] was in the defendant's residence or place of business," the judge should instruct that one element of illegal possession of a firearm is that "the defendant possessed the firearm outside of his (her) residence or place of business." See Instruction 7.600 of the Criminal Model Jury Instructions for Use in the District Court (rev. Jan. 2013).

Id. at 742-743. Accordingly, "[w]e have defined the term 'residence' to include" only those areas "over which the [individual] retains exclusive control." Commonwealth v. Coren, 437 Mass. 723, 734 (2002). The residence exemption, therefore, does not apply where a defendant possesses or controls a firearm in the "[p]ublic streets, sidewalks, [or] common areas [of an apartment building] to which occupants of multiple dwellings have access." Id. Moreover, if a defendant's firearm is stored within his or her vehicle, the residence exemption applies only if the vehicle is located within or on the defendant's residence. See Harris, 481 Mass. at 780.

This reasoning "applies with equal force to the exemption for a person's place of business." See Commonwealth v. Belding, 42 Mass. App. Ct. 435, 438 (1997). An individual has an interest in protecting his or her place of business, but that interest is attenuated when the individual enters an area that is not within the exclusive control of that business. See id. See also Prince George's County v. Blue, 206 Md. App. 608, 621 (2012), aff'd, 434 Md. 681 (2013) ("The display of a weapon by a security guard indoors could halt violence by unarmed patrons inside the establishment. However, drawing a handgun to chase a malefactor across a parking lot, where he or she may have a weapon hidden in a car, invites possible battlefield-type carnage"). Accordingly, given the Legislature's intent to

"protect the public from the potential danger incident to the unlawful possession of [firearms]," a firearm located within a parking lot falls within the place of business exemption only if the parking lot is within the exclusive control of the business. See Commonwealth v. Lindsey, 396 Mass. 840, 842-843 (1986). See also Sherrod v. State, 484 So. 2d 1279, 1281 (Fla. Dist. Ct. App. 1986) (residence exception to firearm statute was inapplicable to individual who carried concealed weapon in "the parking lot of a multiple unit apartment dwelling"); Blue, supra at 623 (place of business exemption is limited to "the interior of the business establishment"); Bryant v. State, 508 S.W.2d 103, 104 (Tex. Crim. App. 1974) (residence exception in firearm statute was inapplicable to resident "with a pistol in his hand in a parking lot shared by other occupants of the apartment complex").

Applying the exclusive control standard here, we conclude that the defendant did not introduce sufficient evidence at trial to support an affirmative defense that the firearm was in or on his place of business. See Anderson, 445 Mass. at 214. Although officers testified that the vehicle was located in the parking lot of the Store, none of this testimony supports a determination that this parking lot was under the Store's

exclusive control.[8]  See Bryant, 508 S.W.2d at 104 (parking lot was not within defendant's premises because "parking spaces were not assigned to tenants and a tenant used whatever space was available").  To the contrary, testimony was introduced that suggested the parking lot was not within the exclusive control of the defendant's employer.  During cross-examination of Lewis, he indicated that the parking lot in front of the Store was part of a larger parking complex.  No evidence was presented to indicate that the Store's section of the parking complex was cordoned off, marked with signage, or under the Store's control in any sense.  See Sherrod, 484 So. 2d at 1281 (quoting Florida Attorney General's advisory opinion stating that exception did not apply to "a large parking lot which serves an entire shopping area").

The defendant also argues that, because Pieroway testified that he had observed the defendant carrying out his job duties while in the parking lot, the parking lot was his "place of business."  "Our primary duty in interpreting a statute is to effectuate the intent of the Legislature in enacting it" (quotation and citation omitted).  Commonwealth v. Curran, 478 Mass. 630, 633 (2018).  "Where the plain language [of a statute]

---

[8] Given this, we need not reach the defendant's argument that the "residence or place of business" exemption also extends to G. L. c. 269, § 10 (m) and (n).

is unclear or ambiguous, we strive to discern the legislative intent in enacting [it] 'from all its parts and from the subject matter to which it relates, and must interpret the statute so as to render the legislation effective, consonant with sound reason and common sense.'" Commonwealth v. Newberry, 483 Mass. 186, 192 (2019), quoting Seideman v. Newton, 452 Mass. 472, 477 (2008). Here, the Legislature cannot have intended that one's "place of business" be anywhere that one conducts business activities. The residence or place of business exemption restricts an individual's unlicensed possession of a firearm to areas where the firearm poses a lesser degree of risk to the public. See Seay, 376 Mass. at 742. "[T]he rule for which [the] defendant contends," however, "would permit one to wander [armed with a firearm] about [public areas] inhabited by hundreds of persons simply because" one is engaged in a business activity (citation omitted). See id. Moreover, G. L. c. 269, § 10 (a) (4), and G. L. c. 140, § 129C (l), (o), provide that certain individuals are exempt from firearms licensure requirements if they possess a firearm in the course of particular business activities. The defendant's reading of the statutory language would render this provision entirely superfluous, as it would exempt any individuals who are engaged in business activities, contrary to our long-standing canon of statutory construction that a statute "must be construed so that

effect is given to all its provisions, so that no part will be inoperative or superfluous" (quotation and citation omitted). Commonwealth v. Keefner, 461 Mass. 507, 511 (2012).

Because no evidence was introduced at trial to support a determination that the firearm was located in or on the defendant's place of business, the defendant was not entitled to an instruction on the place of business exemption.[9]

c. Instruction on exemption for possession of license. The defendant also argues that his convictions should be reversed because the jury were not instructed that, to find him guilty of unlawful possession of a firearm, the Commonwealth had to prove that he did not have a firearms license. Although he did not seek such an instruction at trial, the defendant now contends that the absence of one violated his rights to due process and his rights under the Second Amendment.

"We do not normally consider on appeal issues that were not fairly raised below . . . ." Commonwealth v. Hilton, 443 Mass. 597, 618 n.12 (2005), S.C., 450 Mass. 173 (2007). This rule, however, "is not without qualification. We have excused the failure to raise a constitutional issue at trial . . . when the constitutional theory on which the defendant has relied was not

---

[9] Because we conclude that there was no error, we need not reach the Commonwealth's argument that the place of business exemption is applicable only where the individual is the owner or proprietor of the business.

sufficiently developed at the time of trial . . . to afford the defendant a genuine opportunity to raise his claim." Commonwealth v. Rembiszewski, 391 Mass. 123, 126 (1984).  This is known as the "clairvoyance exception."  See Commonwealth v. Connolly, 454 Mass. 808, 830 (2009).  Here, the defendant's argument depends upon the United States Supreme Court's holding in Bruen, 142 S. Ct. at 2122, in which the Court established the right to possess a firearm outside the home.  The defendant's trial took place in 2021, prior to the release of this decision. The defendant, therefore, did not have an adequate opportunity at the time of his trial to raise the present issue.  See Commonwealth v. Johnson, 461 Mass. 44, 54 n.13 (2011).  We therefore "conclude that the defendant is entitled" to our review of this issue.  See Commonwealth v. Hinckley, 422 Mass. 261, 266-267 (1996).

For each of the crimes of which the defendant was convicted -- illegal possession of a firearm, illegal possession of a large capacity feeding device, illegal possession of ammunition, and illegal possession of a loaded firearm -- the defendant would not have been in violation of the law if he had obtained a proper license to engage in the proscribed activity. See Cassidy, 479 Mass. at 532 (G. L. c. 269, § 10 [m]); Johnson, 461 Mass. at 58 (G. L. c. 269, § 10 [a], [h], [n]).  Under the current statutory regime, however, "licensure is an affirmative

defense, not an element of the crime." Commonwealth v. Allen, 474 Mass. 162, 174 (2016), quoting Commonwealth v. Norris, 462 Mass. 131, 145 (2012). General Laws c. 278, § 7, provides that "[a] defendant in a criminal prosecution, relying for his [or her] justification upon a license . . . shall prove the same; and, until so proved, the presumption shall be that [the defendant] is not authorized." Accordingly, this court has held that, to convict a defendant under G. L. c. 269, § 10, "the Commonwealth does not need to present evidence to show that the defendant did not have a license or firearm identification card." Colon, 449 Mass. at 226. Rather, as is the case for the place of business exemption, "the burden [has been] on the defendant to come forward with . . . evidence" that he or she has a license to possess a firearm (quotation and citation omitted). Id. Once the defendant does so, the burden then shifts to the Commonwealth "to persuade the trier of facts beyond a reasonable doubt that the [license] does not exist." Commonwealth v. Humphries, 465 Mass. 762, 769 (2013), quoting Gouse, 461 Mass. at 802.

As discussed, States may place "on defendants the burden of proving affirmative defenses." Gouse, 461 Mass. at 804, quoting Gilmore v. Taylor, 508 U.S. 333, 341 (1993). The due process clause of the Fourteenth Amendment, however, "requires the Commonwealth to prove every essential element of the offense

beyond a reasonable doubt." Commonwealth v. Brown, 477 Mass. 805, 815 (2017), cert. denied, 139 S. Ct. 54 (2018), quoting In re Winship, 397 U.S. 358, 364 (1970). "Instructions to the jury that would lead them to believe otherwise are constitutional error." Commonwealth v. Cruz, 456 Mass. 741, 752 (2010). Hence, while an affirmative defense may "excuse[] conduct that would otherwise be punishable," it may not "controvert any of the elements of the offense itself." Smith v. United States, 568 U.S. 106, 110 (2013), quoting Dixon v. United States, 548 U.S. 1, 6 (2006). Otherwise put, "an affirmative defense may not, in operation, negate an element of the crime which the government is required to prove." United States v. Johnson, 968 F.2d 208, 213 (2d Cir.), cert. denied, 506 U.S. 964 (1992).

Thus, to address the defendant's argument, we must determine whether, since the United States Supreme Court's decision in Bruen, 142 S. Ct. at 2122, the failure to obtain a valid firearms license is now an essential element of unlawful possession of a firearm. If so, the defendant's rights to due process were violated when the judge placed upon him the onus of presenting evidence of licensure, and we must reverse his convictions. See Walton v. Arizona, 497 U.S. 639, 650 (1990) (State cannot allocate burden of proof in way that "lessen[s] the State's burden to prove every element of the offense charged"); Commonwealth v. Mills, 436 Mass. 387, 398 (2002) ("A

criminal conviction cannot be affirmed on appeal where the jury were not instructed on the elements of the theory of the crime").

In answering this question, we cannot simply look to the plain statutory language. If, through amending statutory language, the Legislature were able to determine which elements of a crime the Commonwealth would be required to prove, it "could undermine [due process] without effecting any substantive change in its law." See Mullaney v. Wilbur, 421 U.S. 684, 698 (1975). Rather, we must engage in "an analysis that looks to the 'operation and effect of the law as applied and enforced by the [Commonwealth],' . . . and to the interests of both the [Commonwealth] and the defendant as affected by the allocation of the burden of proof." Id. at 699, quoting St. Louis S.W. Ry. v. Arkansas, 235 U.S. 350, 362 (1914).

For instance, in Commonwealth v. Munoz, 384 Mass. 503, 503 (1981), the defendant was convicted of operating an uninsured motor vehicle. The judge had instructed the jury that "the defendant has the responsibility and the obligation of showing that, as a matter of fact, [the vehicle he was operating] was insured." Id. at 505. The Commonwealth argued that this instruction was correct, "because G. L. c. 278, § 7, which places the burden on the defendant to produce evidence of license or authority," implied that the defendant bore the

"burden of producing some evidence of automobile insurance."
Id. at 506.  We concluded that G. L. c. 278, § 7, did not apply
to the crime of operating an uninsured vehicle, as "noninsurance
is an element, in fact, the central element of [such] a
prosecution."  Id. at 507.  Accordingly, because "insurance is
an element of the crime charged, not a mere license or
authority[,] . . . the issue of insurance cannot be viewed as an
affirmative defense and, [therefore], it cannot be removed from
jury consideration."  Id. at 507.  Thus, obtaining a conviction
required the Commonwealth to prove beyond a reasonable doubt
that the vehicle was uninsured.  Id. at 508.  See Cabral, 443
Mass. at 179 ("Because the absence of lawful authority or
justification is an element of each of the crimes charged, the
Commonwealth must prove beyond a reasonable doubt that each
defendant acted without lawful authority or justification").

In Gouse, 461 Mass. at 801-802, we held that licensure is
not an essential element of unlawful possession of a firearm.
We reasoned, rather, that under G. L. c. 269, § 10 (a), and
G. L. c. 278, § 7, the "holding of a valid license brings the
defendant within an exception to the general prohibition against
carrying a firearm."  Id. at 802, quoting Commonwealth v. Jones,
372 Mass. 403, 406 (1977).  That decision followed two United
States Supreme Court decisions in which the Court ruled on the
extent of the protections provided by the Second Amendment.  In

*Heller*, 554 U.S. at 635, the Court held that the Second Amendment protects the right to possess an operable firearm in the home. Then, in *McDonald* v. *Chicago*, 561 U.S. 742, 750 (2010), the Court held that the "Second Amendment Right is fully applicable to the States." The defendant in *Gouse*, *supra* at 801, argued that "the allocation of burdens under [G. L. c. 278, § 7,] contravenes the [United States Supreme Court's] holdings [in] *McDonald* and *Heller* by permitting a presumption of criminality from constitutionally protected conduct -- the possession of a firearm." We concluded that *Heller* and *McDonald* established only a "right 'to possess a handgun in the home for the purpose[] of self-defense.'" *Gouse*, *supra* at 801, quoting *McDonald*, *supra* at 791. The prohibition against possessing a firearm *outside* the home therefore "[did] not implicate this right." *Gouse*, *supra* at 802. Therefore, requiring that a defendant who was charged with unlawful possession outside the home "produce some evidence of a license at trial -- and recognizing a consequent presumption of unauthorized possession where [the defendant] fails to do so -- [did] not infringe on constitutionally protected conduct." *Id*.

Since our decision in *Gouse*, 461 Mass. at 807-808, the United States Supreme Court has determined that the Second Amendment right to possess a firearm applies outside the home. See *Bruen*, 142 S. Ct. at 2134. In *Bruen*, *supra* at 2122, 2134,

the Court concluded that the Second Amendment's protection of "the individual right to possess and carry weapons in case of confrontation" requires that one have a "right to carry handguns publicly" (citation omitted).  The Court reasoned that "the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' and confrontation can surely take place outside the home."  Id. at 2135, quoting Heller, 554 U.S. at 592.

In the wake of Bruen, this court's reasoning in Gouse, 461 Mass. at 802, is no longer valid.  It is now incontrovertible that a general prohibition against carrying a firearm outside the home is unconstitutional.  See Bruen, 142 S. Ct. at 2134.  Because possession of a firearm outside the home is constitutionally protected conduct, it cannot, absent some extenuating factor, such as failure to comply with licensing requirements, be punished by the Commonwealth.  See id. at 2122-2123.  Accordingly, the absence of a license is necessary to render a defendant's possession of a firearm "punishable."  See Smith, 568 U.S. at 110, quoting Dixon, 548 U.S. at 6. (affirmative defense does not negate element of crime where it "excuse[s] conduct that would otherwise be punishable").  It follows, then, that failure to obtain a license is a "fact necessary to constitute" the crime of unlawful possession of a

firearm.  See Smith, supra, quoting In re Winship, 397 U.S. at 364.

We therefore conclude that the absence of a license is an essential element of the offense of unlawful possession of a firearm pursuant to G. L. c. 269, § 10 (a).  General Laws c. 278, § 7, which provides that licensure is an affirmative defense, is no longer applicable to G. L. c. 269, § 10 (a).  See Munoz, 384 Mass. at 506, quoting Jones, 372 Mass. at 405 (G. L. c. 278, § 7, applies only "to situations where '[a]s [a] matter of statutory construction, the prohibition is general, the license is exceptional'").  Rather, to convict a defendant of unlawful possession of a firearm, the Commonwealth must prove "as an element of the crime charged" that the defendant in fact failed to comply with the licensure requirements for possessing a firearm.  See Munoz, supra at 507.

The District of Columbia Court of Appeals employed similar reasoning in Herrington v. United States, 6 A.3d 1237, 1239-1240 (D.C. 2010), a case that was cited with approval in Gouse, 461 Mass. at 802.  In that case, the defendant's conviction of unlawful possession of ammunition "was based solely on evidence that he possessed handgun ammunition in his home."  Herrington, supra at 1239.  Under the relevant statute, the defendant had the burden of establishing that he had complied with "valid registration and licensing requirements."  Id. at 1241-1242.

The court determined that the statute was unconstitutional under the due process clause and the Second Amendment, because "[w]here the Constitution -- in this case, the Second Amendment -- imposes substantive limits on what conduct may be defined as a crime, a [L]egislature may not circumvent those limits by enacting a statute that presumes criminality from constitutionally-protected conduct and puts the burden of persuasion on the accused to prove facts necessary to establish innocence."  Id. at 1244.

Here, as stated, the jury convicted the defendant of unlawful possession of a firearm without being instructed that, to do so, they must have determined that the defendant did not have a firearms license.  See Neder v. United States, 527 U.S. 1, 10 (1999) ("improperly omitting an element from the jury . . . precludes the jury from making a finding on the actual element of the offense" [emphasis in original]).  As a result, the defendant was convicted of a crime solely on the ground that he had engaged in the constitutionally protected conduct of possessing a firearm in public.  This violated the defendant's rights to due process and rights under the Second Amendment.  See Montana v. Egelhoff, 518 U.S. 37, 54 (1996), citing In re Winship, 397 U.S. at 364.

The Commonwealth argues that the defendant's due process rights were not violated because the Second Amendment does not

prevent the States from imposing licensing requirements on the possession of firearms. See Bruen, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun"). The Second Amendment certainly does not "imperil every law regulating firearms." See Powell, 459 Mass. at 586, quoting McDonald, 561 U.S. at 786. The issue we confront here, however, is the burden of proof that must accompany such laws. The Commonwealth may impose licensing requirements upon the possession of firearms, but in enforcing those requirements, it must prove beyond a reasonable doubt that a defendant failed to comply with them. See Herrington, 6 A.3d at 1245.

The Commonwealth also points to our language in Commonwealth v. Loadholt, 460 Mass. 723, 727 (2011), where we said that "[n]othing in the McDonald and Heller decisions has altered or abrogated the state of the law concerning the statutory presumption set forth in G. L. c. 278, § 7." The Commonwealth asserts that, if McDonald and Heller did not alter the state of the law concerning the burden of proof regarding proper licensure, then Bruen does not either. In Loadholt, supra at 726-727, however, we stated that we would "not address the defendant's claims that . . . G. L. c. 278, § 7, creates an unconstitutional presumption," because "[t]he defendant did not

raise these arguments at trial or in his original brief on direct appeal" (footnote omitted).  See Commonwealth v. Mathews, 450 Mass. 858, 871 (2008) (discounting dicta as precedent).

In addition, we cannot abandon the requirement that the Commonwealth prove each essential element of a crime simply because obtaining a conviction would be "a heavy burden for the prosecution to satisfy."  See Mullaney, 421 U.S. at 701.  In Gouse, 461 Mass. at 806, we noted that it would be a "daunting task" for the Commonwealth to prove beyond a reasonable doubt that a defendant had no such license.  We reasoned that, "[o]n the other hand, placing the onus on the defendant to produce some evidence at trial that he was licensed to carry a firearm would involve the very simple task of produc[ing] that slip of paper indicating [such authorization]" (quotations and citations omitted).  Id.  As we indicated, however, this reasoning is not applicable where the Second Amendment requires that licensure is an essential element of the crime.  See id. at 801-802.  The Commonwealth's burden of proving the essential element of a crime "cannot be altered because of any difficulty the Commonwealth may have in proving [the element] as compared to the relative ease with which the defendant could prove [its negative]."  See Munoz, 384 Mass. at 509-510.

The defendant argues that licensure is also an essential element of the crime of unlawful possession of ammunition under

G. L. c. 269, § 10 (h). We agree. In Heller, 554 U.S. at 630, the United States Supreme Court concluded that a requirement that firearms kept in the home "be rendered and kept inoperable at all times" violated the Second Amendment, because the requirement made it "impossible for citizens to use [their firearms] for the core lawful purpose of self-defense." A general prohibition on ammunition similarly would render it impossible for citizens to use their firearms for purposes of self-defense; in the absence of ammunition, a firearm is effectively inoperable. See United States v. Miller, 307 U.S. 174, 179-180 (1939) (citing Seventeenth Century commentary on gun use in America that "[t]he possession of arms also implied the possession of ammunition"). See, e.g., Association of N.J. Rifle & Pistol Clubs v. Attorney Gen. N.J., 910 F.3d 106, 116 (3d Cir. 2018), quoting Jackson v. City & County of San Francisco, 746 F.3d 953, 967 (9th Cir. 2014), cert. denied, 576 U.S. 1013 (2015) ("Regulations that eliminate 'a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose'"); Jackson, supra, quoting Ezell v. Chicago, 651 F.3d 684, 704 (7th Cir. 2011) ("'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them"); Herrington 6 A.3d at 1243 ("from the Court's reasoning [in Heller], it logically follows that the right to keep and

bear arms extends to the possession of handgun ammunition"). Because a general prohibition on ammunition would violate the Second Amendment, the reasoning that we have applied to G. L. c. 269, § 10 (a), must apply as well to G. L. c. 269, § 10 (h). Accordingly, we conclude that the defendant's rights under the Second Amendment and his rights to due process were violated when he was convicted of unlawfully possessing ammunition although the jury were not instructed that licensure is an essential element of the crime.

Nonetheless, we decline the defendant's suggestion that we extend this holding to the crime of unlawful possession of a large capacity feeding device. See G. L. c. 269, § 10 (m). We previously have held that G. L. c. 140, § 131M, a statute that proscribes possession of large capacity feeding devices, "is not prohibited by the Second Amendment, because the right [to bear arms] 'does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes.'" Cassidy, 479 Mass. at 540, quoting Heller, 554 U.S. at 625. See Worman v. Healey, 922 F.3d 26, 30, 40 (1st Cir. 2019), cert. denied, 141 S. Ct. 109 (2020) ("Massachusetts law proscribing the sale, transfer, and possession of certain semiautomatic assault weapons and large-capacity magazines" does not violate Second Amendment). Accordingly, we conclude that the defendant was not entitled to

an instruction that licensure is an essential element of unlawful possession of a large capacity feeding device.

Finally, we conclude that our holding here should not be applied retroactively to convictions that became final prior to the United States Supreme Court's decision in Bruen, 142 S. Ct. at 2122. "The retroactivity of a constitutional rule of criminal procedure turns on whether the rule is 'new' or 'old.'" See Commonwealth v. Perry, 489 Mass. 436, 463 (2022), quoting Commonwealth v. Ashford, 486 Mass. 450, 457 (2020). A case "announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final" (emphasis in original). Commonwealth v. Bray, 407 Mass. 296, 301 (1990), quoting Teague v. Lane, 489 U.S. 288, 301 (1989). The rule we announce today is dictated by the Court's decision in Bruen. Accordingly, our holding applies prospectively and to those cases that were active or pending on direct review as of the date of the issuance of that decision. See Perry, supra at 464.

3. Conclusion. The defendant's convictions on the indictments charging unlawful possession of a firearm, unlawful possession of ammunition, and unlawful possession of a loaded firearm are vacated and set aside, and the matter is remanded to the Superior Court for entry of judgments of not guilty on those indictments. The defendant's conviction on the indictment

charging unlawful possession of a large capacity feeding device is affirmed.

So ordered.

LOWY, J. (concurring, with whom Georges, J., joins).  I agree with the court's reasoning and its conclusion that, in light of the United States Supreme Court's decision in New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022), a defendant's lack of a valid firearms license must be treated as an essential element of the offense of unlawful possession of a firearm pursuant to G. L. c. 269, § 10 (a), which the Commonwealth must prove beyond a reasonable doubt as part of its case-in-chief.

I write separately to address certain evidentiary issues concerning the admissibility of firearms licensing records that will likely arise in pending and future cases as a result of this ruling.  I recognize that the issues I discuss here have not been directly addressed in the record or the arguments in this case; nor have the issues been vetted by the full court.  Accordingly, everything that I suggest will need to be tested and refined in the crucible of future litigation or rulemaking.  Nevertheless, given the high volume of cases involving charges for unlicensed possession of a firearm or ammunition that are handled by our courts,[1] I venture these suggestions to offer some guidance.

_____

[1] According to data published by the Trial Court's Department of Research and Planning, in fiscal year 2022, over 6,000 charges for carrying a firearm without a license, carrying

In general, as I explain in further detail infra, properly authenticated firearms licensing records that have been made and kept in the normal course of an agency's affairs should ordinarily be admissible under the official records and business records exceptions to the rule against hearsay. The admission of these records should not ordinarily violate a defendant's rights under confrontation clause[2] of the Sixth Amendment to the United States Constitution because such records were not "made with the primary purpose of creating an out-of-court substitute for trial testimony" (quotation and citation omitted). Commonwealth v. Rand, 487 Mass. 811, 815 (2021). Indeed, depending on how the records are kept, and the witness's level of familiarity with the records, it may well be that the absence of the defendant's name from such records would constitute prima facie evidence of a lack of a license.

---

a loaded firearm without a license, and possession of a firearm or ammunition without a firearm identification card, in violation of G. L. c. 269, § 10, were filed in the District Court and Boston Municipal Court, and over 2,400 such indictments were returned in the Superior Court. See https: //public.tableau.com/app/profile/drap4687/viz/MassachusettsTrial CourtChargesDashboard/AllCharges [https://perma.cc/25AT-JY2V].

[2] See Sixth Amendment to the United States Constitution ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . ."); Melendez-Diaz v. Massachusetts, 557 U.S. 305, 309 (2009) (Sixth Amendment applies to States via Fourteenth Amendment of United States Constitution). See also art. 12 of the Massachusetts Declaration of Rights ("every subject shall have a right . . . to meet the witnesses against him face to face").

Agency certificates or affidavits stating that there is no record of a firearms license issued to a defendant, unlike agency lists, are more problematic. Although such certificates of the nonexistence of an official record are admissible under an exception to the rule against hearsay, their admission at trial without a testifying witness from the agency responsible for keeping such records, and who is familiar with how the records are kept, made, and stored, will likely be deemed a violation of a defendant's rights under the confrontation clause.

1. Records of firearms licensing. "In Massachusetts, local police departments are responsible for the issuance of firearms licenses to individuals who reside or have a place of business within the jurisdiction." Commonwealth v. Adams, 482 Mass. 514, 531 (2019).[3] Local police departments are required to

---

[3] "Most licenses are issued by municipal police departments. The State Police issues Gun Club Licenses and is also responsible for Licenses to Carry for active and retired troopers. The Firearms Records Bureau issues non-resident licenses and resident alien permits." Executive Office of Public Safety and Security, Data About Firearms Licensing and Transactions, https://www.mass.gov/info-details/data-about-firearms-licensing-and-transactions [https://perma.cc/L7SE -FFJK]. See G. L. c. 140, § 121 (defining "licensing authority" as "the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them"); G. L. c. 140, § 129B (1) ("Any person residing or having a place of business within the jurisdiction of the licensing authority . . . may submit to the licensing authority an application for a firearm identification card, or renewal of the

make certain records regarding firearms licenses and to forward copies of applications, issued licenses, and notices of revocation and suspension to the Department of Criminal Justice Information Services, where those records are collected by the firearms records bureau.[4]

---

same . . ."); G. L. c. 140, § 131 (d) ("A person residing or having a place of business within the jurisdiction of the licensing authority . . . may submit to the licensing authority or the colonel of state police an application for a license to carry firearms, or renewal of the same").

[4] See Commonwealth v. Gouse, 461 Mass. 787, 805 (2012) (local police departments required to record all issued licenses and notify Department of Criminal Justice Information Services); G. L. c. 140, § 129B (4) ("Notices of revocation and suspension shall be forwarded to the commissioner of the department of criminal justice information services and the commissioner of probation and shall be included in the criminal justice information system"); G. L. c. 140, § 129B (13) ("Upon issuance of a firearm identification card under this section, the licensing authority shall forward a copy of such approved application and card to the executive director of the criminal history systems board . . ."); G. L. c. 140, § 131 (f) ("Notices of revocation and suspension shall be forwarded to the commissioner of the department of criminal justice information services and the commissioner of probation and shall be included in the criminal justice information system"); G. L. c. 140, § 131 (n) ("Upon issuance of a license to carry or possess firearms under this section, the licensing authority shall forward a copy of such approved application and license to the commissioner of the department of criminal justice information services . . ."); Municipal Records Retention Schedule (updated Sept. 1, 2022), at 89, https://www.sec.state.ma.us/arc/arcpdf/Municipal_Retention_Schedule_20220901.pdf [https://perma.cc/C9TT-7N53] (providing for retention by municipalities of firearm identification cards and license to carry applications until superseded); Executive Office of Public Safety and Security, Data about Firearms Licensing and Transactions, https://www.mass.gov/info-details/data-about-firearms-licensing-and-transactions#license-applications-&-active-licenses

2. Admissibility under exceptions to the rule against hearsay. If properly authenticated, firearms licensing records like those described supra would likely qualify for admission under the "official records" exception to the rule against hearsay. See G. L. c. 233, § 76; Mass. R. Crim. P. 40 (a), 378 Mass. 917 (1979); Mass. G. Evid. § 803(8)(A) (2022). The Reporter's Notes to Mass. R. Crim. P. 40 (a) define "official records" as "including records of any governmental entity, . . . and more particularly as 'all documents prepared by public officials pursuant to a duty imposed by law or required by the nature of their offices'" (citation omitted).

Firearms licensing records may also be admissible under the business records exception to the rule against hearsay, where the records have been made in good faith in the regular course of business before the beginning of the proceeding in which they are offered and it was the regular course of the agency to make such records at the time of the transaction or within a reasonable time thereafter. See G. L. c. 233, § 78;

---

[https://perma.cc/MS43-M2XW] ("The Firearms Records Bureau is the Commonwealth's repository for all firearms license and transaction data. . . . Massachusetts's electronic license check system . . . is updated by police departments, which process license applications and update license statuses, and by firearms dealers, who enter records of their transactions"); Firearms Records Bur. v. Simkin, 466 Mass. 168, 168 n.2 (2013) (firearms records bureau is part of Department of Criminal Justice Information Services).

Commonwealth v. Fulgiam, 477 Mass. 20, 39-42, cert. denied, 138 S. Ct. 330 (2017) (ten-print fingerprint cards made by police were properly admissible under business records exception); id. at 47 (Lowy, J., concurring); Mass. G. Evid. § 803(6)(A).

The exceptions to the rule against hearsay and the rules of criminal procedure also permit the absence of a firearms license in the defendant's name to be shown by an authenticated written statement from the legal custodian of the firearms licensing records, or a deputy, that after diligent search, no record could be found of a valid firearms license issued in the name of the defendant at the time of the offense.  See Mass. R. Crim. P. 40 (b), 378 Mass. 917 (1979) (properly authenticated "written statement that after diligent search no record or entry of a specified tenor is found to exist in the records designated by the statement . . . is admissible as evidence that the records contain no such record or entry"); Mass. G. Evid. § 803(10) ("certification under [§] 902 . . . that a diligent search failed to disclose a public record or statement is admissible in evidence if the testimony or certification is offered to prove that [A] the record or statement does not exist, or [B] a matter did not occur or exist, if a public office regularly kept a record or statement for a matter of that kind"); Mass. G. Evid. § 902(b) ("An official record kept within the Commonwealth, or an entry therein, when admissible for any purpose, may be

evidenced . . . by a copy attested by the officer having legal custody of the record, or by that officer's deputy").[5]

Finally, I note that under the exceptions to the rule against hearsay, witness testimony may also suffice to show the absence of an official record, such as the record of a firearms license, as provided in Mass. G. Evid. § 803(10). Care should be taken in relying on such testimony alone for at least two reasons: (1) there must be an adequate foundation for the witness's testimony explaining his or her sufficient familiarity with how the record was created, maintained, and accessed; and (2) insofar as the witness testifies as to the contents of computer-stored records, those records may constitute hearsay. See Commonwealth v. Royal, 89 Mass. App. Ct. 168, 169-173 (2016) (State police trooper's testimony that he checked motor vehicle

---

[5] Technically, a statement as to the nonexistence of an agency record is not hearsay, because it does not involve an out-of-court assertion:

> "As a general rule, silence is not classified as hearsay. Logically, therefore, the absence of an entry in a public record should not be considered hearsay when offered for that purpose, and should be admissible over a hearsay objection as a basis to infer that the event did not occur or the condition did not exist."

5 C.S. Fishman & A. Toomey McKenna, Jones on Evidence § 34:54 (7th ed. 2023). Nevertheless, to avoid any confusion, the drafters of the Federal Rules of Evidence treated testimony or certifications concerning the nonexistence of a public record as an exception to the rule against hearsay, see id., and the Massachusetts Guide to Evidence has taken the same approach.

registry database and defendant's license was listed as suspended was inadmissible hearsay because such records were computer-stored, but "the Commonwealth could have proved the element of license suspension without implicating the rule against hearsay if it had introduced a properly certified copy of a registry driving history record showing that the defendant's license had been suspended").

3. Admissibility under confrontation clause. The fact that a firearms licensing record, or a certificate attesting to the nonexistence of such a record, may be admissible under exceptions to the rule against hearsay does not suffice to show that the record or certificate of its nonexistence can also meet the distinct requirements of the confrontation clause in a criminal case. See Commonwealth v. Greineder, 464 Mass. 580, 585 n.4, cert. denied, 571 U.S. 865 (2013) ("There is an important distinction between satisfying the mandates of common-law evidentiary rules and satisfying the mandates of the confrontation clauses of the Federal and State Constitutions. In criminal cases, out-of-court statements are only admissible if they satisfy both; failure to satisfy either the applicable rules of evidence or the Federal and State Constitutions will result in the exclusion of evidence").

In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), the United States Supreme Court held that the petitioner's rights

under the confrontation clause were violated where sworn written certificates from State laboratory analysts, describing the substance seized from the petitioner as cocaine, were admitted in lieu of live testimony at the petitioner's trial on charges of cocaine distribution and trafficking. See id. at 308-311, 329. In reaching this conclusion, the Court reasoned:

> "Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because -- having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial -- they are not testimonial. Whether or not they qualify as business or official records, the analysts' statements here -- prepared specifically for use at petitioner's trial -- were testimony against petitioner, and the analysts were subject to confrontation under the Sixth Amendment."

Id. at 324. Thus, the critical question, for purposes of determining whether admission of an agency record violates the confrontation clause, is whether the record was created in the normal course of the agency's affairs, or whether it is "testimonial," that is, whether it was created for the purpose of proving some fact at trial.

It is also noteworthy that the Melendez-Diaz Court cited a line of cases where "the prosecution sought to admit in[] evidence a clerk's certificate attesting to the fact that the clerk had searched for a particular relevant record and failed to find it." Id. at 323. In those cases, the Court indicated, the clerk's statement was testimonial in effect because it

"would serve as substantive evidence against the defendant whose guilt depended on the nonexistence of the record for which the clerk searched," and consequently "the clerk was . . . subject to confrontation." Id.[6]

In accord with Melendez-Diaz, this court has held that the admission of documents at trial that were made contemporaneously with the underlying event in the regular course of a business's or an agency's affairs does not violate the confrontation clause because such documents are not testimonial. See, e.g., Fulgiam, 477 Mass. at 43 (admission of ten-print fingerprint cards made by State police did not violate confrontation clause); Commonwealth v. Siny Van Tran, 460 Mass. 535, 552 (2011) (admission of passenger manifest and ticket inquiry made by airline did not violate confrontation clause).

But where a document is subsequently created by an agency to establish a fact at trial, this court has held that it is testimonial and its admission violates the confrontation clause, even though the document is based on preexisting agency records. For example, in Commonwealth v. Parenteau, 460 Mass. 1 (2011),

---

[6] Later that year, the Supreme Court also vacated a decision of the United States Court of Appeals for the Ninth Circuit, which had held that a clerk's certificate as to the nonexistence of a record was not testimonial, and remanded the case "for further consideration in light of Melendez-Diaz." See United States v. Norwood, 555 F.3d 1061, 1066 (9th Cir.), vacated and remanded, 558 U.S. 983 (2009). See also United States v. Norwood, 595 F.3d 1025, 1030 (9th Cir. 2010) (on remand).

where the defendant had been charged with driving after his license had been revoked, this court held that the admission of a certificate from the registry of motor vehicles created after the defendant's arrest and attesting that a notice of license revocation had been mailed to the defendant violated the confrontation clause where it was presented at the defendant's trial to prove that he had received notice of the revocation without any other testimony from the registry.  See id. at 2-3. The court noted that the actual notice of the defendant's license revocation constituted a business record that had been made and kept in the ordinary course of the registry's affairs, but it did not show that the notice actually had been mailed on the date when it was created.  See id. at 10.  If the registry had made a contemporaneous record of the mailing as part of the administration of its regular business affairs, then it would have been properly admissible at the defendant's trial.  But the registry certificate that was presented at trial was dated two years later, three months before the trial.  The court therefore concluded that it had been created for the purpose of establishing an essential fact at trial and did not constitute a nontestimonial business record.  See id.

Since Melendez-Diaz, this court has not had occasion to consider whether admission of a certificate as to the nonexistence of a record would violate the confrontation clause,

but a number of other courts have. Most pertinently for purposes here, the Supreme Court of New Jersey has held that, where a defendant was tried on various gun charges, his confrontation right was violated by the admission of an affidavit from a nontestifying witness attesting that a search of the State's firearm registry database produced no evidence that a handgun permit had been issued to the defendant. See State v. Carrion, 249 N.J. 253, 263-264, 272-274 (2021). The court observed that, although the underlying firearm license database was not itself testimonial in character, the creation of a document attesting to a search of that database for the purpose of prosecuting the defendant was. Id. at 272. The defendant's confrontation right was violated because, "[w]ith only the affidavit, and with no opportunity to question the officer knowledgeable about how the search of the database was performed, [the defendant] could not explore whether the officer used the correct date of birth, name, or other identifying information such as a [S]ocial [S]ecurity number in order to generate a correct search of the database, and what information that search produced." Id. at 272. Other courts have similarly held since Melendez-Diaz that the confrontation clause is violated by the admission in a criminal trial of an affidavit attesting to the nonexistence of a record without testimony from

a witness.[7]  This case law indicates that admission of an

affidavit stating that a diligent search of the firearms records

did not disclose any record in the name of a defendant would

likely violate the confrontation clause if presented without

testimony from a witness.

Instead, to meet the requirements of the confrontation

clause, the Commonwealth would likely have to present a witness

who actually undertook a search of the firearms licensing

records and determined that the defendant lacked a license.  As

---

[7] See, e.g., Government of Virgin Islands v. Gumbs, 426 Fed. Appx. 90, 93-94 (3d Cir. 2011), cert. denied, 565 U.S. 1125 (2012) (lower court erred in admitting certificate as to nonexistence of gun license without affording defendant opportunity to confront person who prepared certificate); United States v. Orozco-Acosta, 607 F.3d 1156, 1161 n.3 (9th Cir. 2010), cert. denied, 562 U.S. 1154 (2011) (overruling prior decisions that had held that certificates of nonexistence of records were not testimonial because those decisions were inconsistent with Melendez-Diaz); United States v. Martinez-Rios, 595 F.3d 581, 586-587 (5th Cir. 2010) (admission of certificate of nonexistence of record, which indicated that defendant had not received consent to reenter United States, violated defendant's confrontation right where no testimony was presented from analyst who conducted records search); Tabaka v. District of Columbia, 976 A.2d 173, 175-176 (D.C. 2009) (department of motor vehicles certificate that its records revealed no evidence of operator's permit having been issued to appellant was testimonial and therefore inadmissible over objection without corresponding testimony by official who had performed search); Washington v. State, 18 So. 3d 1221, 1223-1224 (Fla. Dist. Ct. App. 2009) (certificate of contractor's nonlicensure was testimonial, and its admission violated his confrontation rights); State v. Jasper, 174 Wash. 2d 96, 113-116 (2012) ("A substantial majority of courts have held since Melendez-Diaz that clerk certifications attesting to the nonexistence of a public record are testimonial statements subject to confrontation"; citing cases and following suit).

the court pointed out in Carrion, the confrontation clause was violated in that case because the defendant was not given an "opportunity to question the officer knowledgeable about how the search of the database was performed." Carrion, 249 N.J. at 272. See Bullcoming v. New Mexico, 564 U.S. 647, 661-663 (2011) (surrogate testimony by analyst who did not actually perform blood alcohol test did not meet requirements of confrontation clause); Commonwealth v. Sullivan, 478 Mass. 369, 376-377 (2017) (evidence that deoxyribonucleic acid [DNA] profile extracted from crime scene matched defendant's DNA in national database was improperly admitted hearsay because those responsible for conducting database testing did not testify and were not subject to cross-examination).[8]

---

[8] This is not to say, however, that the testifying witness must necessarily be the same person who conducted the original search of the firearms licensing records that led to the charge against the defendant. See United States v. Soto, 720 F.3d 51, 59 n.5 (1st Cir.), cert. denied, 571 U.S. 930 (2013), citing Bullcoming, 564 U.S. at 666, 674 ("In part IV of the Supreme Court's Bullcoming opinion, joined only by Justice Scalia, Justice Ginsburg observed that the [S]tate could have avoided a Sixth Amendment violation when it realized that the original scientist was unavailable to testify 'by asking [the testifying analyst] to retest the sample, and then testify to the results of his retest rather than to the results of a test he did not conduct or observe.' . . . Justice Kennedy, with Chief Justice Roberts, Justice Breyer, and Justice Alito, in dissent, concluded that testimony from a knowledgeable lab representative is sufficient under the Sixth Amendment. . . . Thus, it appears that six justices would find no Sixth Amendment violation when a second analyst retests evidence and testifies at trial about her conclusions about her independent examination").

For example, testimony from a representative from the firearms records bureau or a police officer, who is familiar with the firearms licensing records and how they are kept, and who undertook a search of those records and did not find a license in the defendant's name, might well meet the requirements of the confrontation clause. Whether such a witness is qualified to testify about the search is a preliminary question for the trial judge to decide. See Mass. G. Evid. § 104(a).

On the other hand, the admission of properly authenticated copies of preexisting firearms licensing records that were made and kept in the ordinary course of business would not violate the confrontation clause, because they are not testimonial. Such records might be used, for example, to show that a defendant's name did not appear in the record, that a defendant's firearms license application was denied, or that the license was suspended or revoked, or that it expired.

It is also conceivable, depending on how the records are compiled, or may be compiled in the future in response to this court's decision today, that a copy of an excerpted alphabetical list of firearms licenses might reveal the absence of a license held by a defendant. Moreover, depending on how such records are complied, such a list may constitute prima facie evidence that the defendant is not licensed to carry a firearm.

In a criminal case in the Commonwealth, "[p]rima facie evidence means that proof of the first fact [(basic fact)] permits, but does not require, the fact finder, in the absence of competing evidence, to find that the second fact [(resultant fact)] is true beyond a reasonable doubt."  Mass. G. Evid. § 302.  "Where there is contrary evidence, the first fact continues to constitute some evidence of the fact to be proved, remaining throughout the trial probative on issues to which it is relevant."  Id.  Put another way, "[i]n criminal cases, when evidence 'A' is prima facie evidence of fact 'B,' then, in the absence of competing evidence, the fact finder is permitted but not required to find 'B' beyond a reasonable doubt." Commonwealth v. Maloney, 447 Mass. 577, 581 (2006).  "The designation of prima facie evidence in this context is 'structurally the same as' a 'permissive inference'" that "satisfies the Commonwealth's burden of production as to one or more elements of a crime."  Commonwealth v. Littles, 477 Mass. 382, 386 (2017), quoting Commonwealth v. Pauley, 368 Mass. 286, 293-293 (1975).  I recognize that most, if not all, prima facie designations in the criminal context in the Commonwealth are a creation of statute.  See Mass. G. Evid. § 302(c) note.[9]  And of

_____

[9] "There are numerous statutes that designate certain evidence as having prima facie effect.  See, e.g., G. L. c. 22C, § 39 (certificate of chemical analysis of narcotics); G. L.

course, the Legislature is free to enact such a statute in the context of firearm licenses, if it so chooses.  As such, in the context of charges relating to unlicensed firearms, it is conceivable that, depending on how records are complied, an excerpted alphabetical list of firearms licenses that did not contain a defendant's name may well constitute prima facie evidence that would "permit[] but not require[ a jury] to find [the defendant to be unlicensed] beyond a reasonable doubt."  Maloney, supra.

4.  Notice-and-demand procedure.  In Melendez-Diaz, 557 U.S. at 326, the Supreme Court also noted that many States have adopted "notice-and-demand statutes," which "require the prosecution to provide notice to the defendant of its intent to use an analyst's report as evidence at trial, after which the defendant is given a period of time in which he may object to the admission of the evidence absent the analyst's appearance live at trial," or otherwise forfeit that right.  The Court made clear that these statutes do not violate the defendant's rights, because "[t]he defendant always has the burden of raising his Confrontation Clause objection," and "notice-and-demand statutes

---

c. 46, § 19 (birth, marriage, or death certificate); G. L. c. 90, [§ 24 (4)] (court record of a prior conviction if accompanied by other documentation); G. L. c. 185C, § 21 (report of inspector in housing court); G. L. c. 233, § 79F (certificate of public way); G. L. c. 269, § 11C (firearm with obliterated serial number)."  Mass. G. Evid. § 302(c) note.

simply govern the <u>time</u> within which he must do so" (emphases in original). <u>Id</u>. at 327.

In 2013, rule 803(10) of the Federal Rules of Evidence was amended to "incorporate[], with minor variations, a 'notice-and-demand' procedure that was approved by the <u>Melendez-Diaz</u> Court." 2013 Advisory Committee Note to Fed. R. Evid. 803. The amended rule provides that the rule against hearsay does not exclude a certification that a diligent search failed to disclose a public record or statement if, among other prerequisites, "in a criminal case, a prosecutor who intends to offer a certification provides written notice of that intent at least [fourteen] days before trial, and the defendant does not object in writing within [seven] days of receiving the notice -- unless the court sets a different time for the notice or the objection." Fed. R. Evid. 803(10)(B).

Similarly, in <u>Carrion</u>, the New Jersey Supreme Court adopted a practice of requiring a defendant to inform the judge and the prosecution of a demand to have the State produce an appropriate witness to testify to a search of the State firearms permit database. Failure to make such a demand waives the defendant's confrontation right. See <u>Carrion</u>, 249 N.J. at 273-274. The court said that this practice would address the State's "valid administrative concern" that "[r]equiring in-person testimony by the person who conducted a search of firearm registry records

that yielded no results under a defendant's name for a gun permit -- in every firearm possession prosecution -- could be burdensome and could lead to administrative inconvenience and waste of resources." Id. at 273.

I suggest that courts handling prosecutions for possession of a firearm without a license should consider adopting a procedure similar to that in Fed. R. Evid. 803(10)(B) as a discovery order and in the filing of pretrial conference reports. This would provide an orderly and uniform procedure for determining whether the Commonwealth may rely on a certificate that there is no firearms license in the name of the defendant, and give the prosecution sufficient time to secure a testifying witness if the defendant objects.[10] This procedure might also serve to mitigate, to some extent, the burden on the Commonwealth that would otherwise result if it were required to produce a testifying witness in every trial involving a charge of unlicensed possession of a firearm.

---

[10] Of course, it may well be that the Commonwealth, nonetheless, calls witnesses who have reviewed the records, and offers documents in which the defendant's name does not appear, in recognition of its burden of persuasion. And it may well be that defendants prefer admission of a certificate of the nonexistence of a record to testimony from witnesses and documentation better to advance their arguments as to reasonable doubt.